### In re McLEAN INDUSTRIES, INC., et al., Debtors.

### UNITED STATES LINES (S.A.), INC., Plaintiff–Appellee,

v.

### UNITED STATES of America, Defendant–Appellant.

No. 91 Civ. 7543 (KTD).

United States District Court, S.D. New York.

Dec. 17, 1993.

As Amended Dec. 22, 1993.

Milbank, Tweed, Hadley & McCloy (Robert Drain, of counsel), New York City, for plaintiff-appellee USL Reorganization Trust.

Mary Jo White, U.S. Atty. (Edward A. Smith, Asst. U.S. Atty., of counsel), New York City, and J. Christopher Kohn, Tracy J. Whitaker and John T. Stemplewicz, Attys., Civ. Div., Dept. of Justice (Richard M. Lorr, Maritime Admin., of counsel), Washington, DC, for defendant-appellant U.S.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge.

Appellant, The United States of America on behalf of the Maritime Administration ("Marad"), Department of Transportation, appeals to this court, pursuant to 28 U.S.C. § 158(a), from an Order of the United States Bankruptcy Court for the Southern District of New York, Cornelius Blackshear, J., granting the USL Reorganization Trust's ("Debtor"), successor in interest to United States Lines (S.A.), Inc., Motion for Summary Judgment and denying Marad's Motion for Summary Judgment. *See United States Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.)*, 132 B.R. 247, 267 (Bankr.S.D.N.Y.1991) (hereinafter *"McLean"*). The decision of the Bankruptcy Court is hereby affirmed in its entirety.

## BACKGROUND

The facts of this case are uncontroverted as they are based on an agreed Pre-trial Order, and they are generally set forth in *McLean*, 132 B.R. at 250–54. The following factual summary recites only those facts pertinent to this appeal.[1]

Moore–McCormack Liners, Inc. ("Moore–McCormack") owned three vessels: (1) S.S.

---

1. Both parties agree that no genuine issue of material fact exists and that the Bankruptcy Court was correct in ruling on the merits of the summary judgment motions. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

AMERICAN ARGO; (2) S.S. AMERICAN RIGEL; and (3) S.S. AMERICAN VEGA (collectively the "Vessels"). Construction of these Vessels was largely financed by federal programs administered by Marad in 1964 and 1965. Marad paid $15 million to Moore–McCormack as a construction-differential subsidy in 1962 (the "1962 CDS"). Additionally, in 1967, Moore–McCormack issued bonds totaling $11,526,000 due April 1, 1987. These bonds were secured by a first preferred ship mortgage on each Vessel (the "1967 Mortgage"). More importantly, the 1967 Mortgage was insured by Marad pursuant to subchapter XI of Merchant Marine Act. 46 U.S.C.App. §§ 1271 *et seq.* Moore–McCormack also received an operating-differential subsidy ("ODS") for the Vessels as authorized by subchapter VI of the Merchant Marine Act. 46 U.S.C.App. §§ 1171 *et seq.*

In 1981, the Vessels underwent extensive modifications, costing approximately $54 million. Marad partly financed these modifications with another construction-differential subsidy (the "1981 CDS"). Marad also guaranteed another issue of bonds by Moore–McCormack, totaling $34,300,000 (collectively with the 1967 guarantee, the "Guarantees" or "Insured Bonds"). The second issue of Insured Bonds was secured by another preferred fleet mortgage in 1983 (the "1983 Mortgage").

In early 1983, McLean Securities, Inc., the parent of United States Lines, Inc., acquired Moore–McCormack and renamed it United States Lines (S.A.), Inc. ("USL"). In order to finance the acquisition, Chemical Bank ("Chemical") loaned $50 million to be partially secured by a preferred fleet mortgage on the Vessels. Chemical's fleet mortgage was subordinate to the 1967 Mortgage and the 1983 Mortgage.

In 1986, as part of a debt restructuring plan prompted by large operating losses, USL requested that Marad and the holders of the Insured Bonds defer the principal payment due June 30, 1986 on the 1983 Mortgage. Marad and the bondholders agreed to defer the payment until June 30, 1988. In return, however, USL agreed to amend the security agreement under the 1983 Mortgage to include certain additional security default covenants (the "Amended Security Agreement").

The Amended Security Agreement contained a covenant requiring USL to obtain Marad's consent prior to bareboat chartering the Vessels.[2] This same restrictive covenant was included in the 1967 Mortgage, the 1981 CDS, USL's ODS, as well as the Reserve Fund and Financial Agreement entered into concurrently with the 1983 Mortgage. None of these agreements, however, restricted Marad's power to consent to a bareboat charter of the Vessels.

On August 15, 1986, USL applied for Marad's consent to a proposed bareboat charter of the Vessels to the Lykes Brothers Steamship Company ("Lykes"). For the previous nine months, USL had not used any of the Vessels for its own operations. In September 1986, USL and Lykes entered into a formal charter agreement ("Agreement to Charter") providing for a three-year bareboat charter of the Vessels. The Agreement to Charter was conditioned expressly upon Marad's consent to USL chartering the Vessels to Lykes.

On October 16, 1986, Marad agreed to consent to the Agreement to Charter subject to certain conditions. Primarily, Marad required an assignment of the charters as additional security for its mortgages on the Vessels. The facts indicate that Marad would not have consented without such an assignment. On November 4, 1986, the parties entered into four agreements: (1) three bareboat charter parties between USL and Lykes (the "Charters"); (2) a Charter Assignment and Agreement between USL, Lykes, and Marad (the "Assignment"); (3) a Depository Agreement between Marad and Chemical (the "Depository Agreement"); and (4) an Agreement between Marad and Lykes (Marad/Lykes Agreement"), which acknowledged

---

2. In a bareboat charter, the charteree takes complete control over the ship for a specified period of time. The shipowner, in return, receives charter hire, i.e. the agreed payment for the ship's use. *See generally* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 239–43 (2d ed. 1975).

Marad's mortgages and its interest in the Charters.

The Charters required that the charter hire be paid to Chemical "for credit to the account of" Marad pursuant to the Assignment. Under the Assignment, USL granted Marad a security interest in its Charters and the charter hire payments to be received from Lykes. It is this transfer from USL to Marad that the Debtor seeks to avoid as a preference under § 547(b) of the Bankruptcy Code. 11 U.S.C. § 547(b).

Pursuant to the Charter, Chemical agreed to receive the charter hire payments under the Depository Agreement. Chemical was to transfer to USL any charter hire paid by Lykes no later than one business day after the funds became available. If Marad notified Chemical of a demand upon the Guarantees, Chemical was to hold charter hire payments subject to Marad's instructions.

On November 24, 1986 ("Petition Date"), USL filed its voluntary petition under Chapter 11 of Title 11 of the Bankruptcy Code; however, it continued to operate its business as a debtor-in-possession in accordance with § 1107 of the Code. 11 U.S.C. § 1107. Debtor (formerly USL) made no payment on the Insured Bonds after the Petition Date. On February 26, 1987, Marad received the first demand upon the Guarantees. Pursuant to the Depository Agreement, Marad instructed Chemical to hold for Marad's account all charter hire deposited by Lykes. Chemical stopped transferring charter hire deposits to Debtor but refused to transfer the deposits directly to Marad without a court order.

After discussions between Debtor and Marad, Debtor acknowledged that Marad should receive all the charter hire that Lykes paid after Marad received the demand on its guarantees, including the charter hire paid prior to Marad's notification to Chemical of the demand upon the Guarantees. Marad and the Debtor signed a Stipulation and Order Providing for Repayment of charter hire (the "Stipulation") requiring Chemical to disburse all Lykes charter hire as Marad may direct. It also provided that the Debtor

would pay Marad $126,000 for charter hire transferred to the Debtor after Marad received the demand upon the Guarantees but before Marad notified Chemical of that demand. The Stipulation was conditioned only upon court approval, and the parties set no time limit for obtaining the requisite court approval.

At a hearing to approve the Stipulation, Chemical, as a creditor, objected to the Stipulation. The hearing was adjourned pending further resolution of Chemical's objection. Marad and Chemical attempted to negotiate a settlement of Chemical's objection to the Stipulation, but they failed to do so. Chemical, nevertheless, did agree to pay interest on the depository account while the matter was pending.

On December 31, 1987, Marad filed a proof of claim for amounts due on the 1967 Mortgage and the 1983 Mortgage. The proof of claim included as a set off the charter hire that Chemical held in the depository account. The Debtor never contested the validity, priority, or amount of Marad's mortgages on the Vessels, and the 1967 and 1983 Mortgages were valid and perfected preferred mortgages under Ship Mortgage Act. 46 U.S.C. App. § 911 *et seq.* As a result of its debts and these mortgages, the Debtor had no equity in the Vessels.

On March 23, 1989, USL's Second Amended and Restated Disclosure Statement (the "Disclosure Statement") was approved by the Bankruptcy Court. On May 16, 1989, the Debtor's First Amended and Restated Joint Plan of Reorganization (the "Plan") was confirmed. In the Plan, the Debtor unqualifiedly assumed the Charters, which still required payment of the charter hire to Chemical. Marad did not object to the confirmation of the Plan or to the assumption of the Charters.

The Debtor then brought an adversary proceeding before the Bankruptcy Court claiming that the Marad must pay Debtor's bankruptcy estate approximately $10 million as an alleged avoidable preference and/or a fraudulent conveyance.[3] The Debtor moved

---

3. The Debtor included a fraudulent conveyance claim in its complaint; however, the Debtor did

for summary judgement on its claims, and Marad cross-moved for summary judgment. The Bankruptcy Court granted the Debtor's motion and denied Marad's cross-motion. Marad appealed in a timely manner and obtained a stay pending this appeal. For the following reasons, the Bankruptcy Court's decision is affirmed in its entirety.

## ISSUES ON APPEAL

The issues raised by this appeal are:

(1) whether Marad waived sovereign immunity when it filed the proof of claim so as to allow the Debtor to initiate an adversary proceeding;

(2) whether the Assignment by USL to Marad constituted an avoidable preference under § 547(b) of the Bankruptcy Court;

(a) whether the charter hire funds were part of the Debtor's estate for voidable preference purposes;

(b) whether Marad received more from the Assignment than it would have received in a Chapter 7 Liquidation proceeding;

(3) whether the "new value" and/or the "improvement in position" exceptions apply so at to make the Assignment non-voidable;

(4) whether the Debtor's assumption of the Charter ratified the Assignment, thereby barring the Debtor's avoidance claim; and

(5) whether the Debtor is estopped from pursuing a preference avoidance claim against Marad after the Debtor represented to Marad in the Stipulation and the Disclosure Statement that Marad was entitled to the charter hire.

I will address these issues seriatim.[4]

not move for summary judgment on the fraudulent conveyance claim. Marad did move to dismiss the fraudulent conveyance claim. The Bankruptcy Court denied Marad's motion because it based its ruling entirely on the avoidable preference claim. *McLean,* 132 B.R. at 256–57. In any event, neither party raised the fraudulent conveyance issue on this appeal; therefore, I will not address it.

4. Findings of fact by a bankruptcy court cannot be set aside unless they are clearly erroneous.

## DISCUSSION

### (1) *Sovereign Immunity*

The Bankruptcy Court ruled that sovereign immunity was waived when Marad filed a proof of claim to set off its debt against the money then held by Chemical in the Depository Account. *McLean,* 132 B.R. at 254–55. Marad contends that it did not assert a claim to the charter hire and that the Bankruptcy Court's characterization as such was flawed.

In general, the United States enjoys sovereign immunity from suit unless it expressly waives such immunity and consents to be sued. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). A waiver of sovereign immunity to be effective must be "unequivocally expressed." *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990).

Congress provided a limited waiver of sovereign immunity in bankruptcy cases in 11 U.S.C. § 106(a), which states:

A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.

11 U.S.C. § 106(a). The Supreme Court recently stated that § 106(a) created an unequivocal waiver. *United States v. Nordic Village,* —— U.S. ——, ——, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992). With § 106(a), Congress plainly waived "sovereign immunity with regard to monetary relief in . . . compulsory counterclaims to government claims." *Id.* The legislative history to § 106(a) indicates that the purpose behind the statute was

Bankr.R. 8013. A bankruptcy court's conclusions of law are subject to *de novo* review. *See In re O.P.M. Leasing Serv., Inc.,* 79 B.R. 161, 162 (S.D.N.Y.1987). Mixed questions of law and fact are also reviewed *de novo. See In re Maitlen,* 658 F.2d 466, 470 (7th Cir.1981). Since the issues here are either purely legal or mixed questions of law and fact, I will review this appeal *de novo.*

to prevent a governmental unit from receiving property of the debtor's estate without subjecting itself to potential liability to the estate. H.R.Rep. No. 595, 95th Cong., 1st Sess. 317 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6274 (hereinafter "House Report"). Therefore, it is clear that § 106(a) establishes a waiver of sovereign immunity.[5]

■ A waiver of sovereign immunity under § 106(a) is, however, limited. A debtor's claim against the government must arise out of the same transaction or occurrence that is the subject of the government's claim against the estate. *995 Fifth Avenue Assoc., L.P. v. New York State Dep't of Taxation and Finance (In re 995 Fifth Avenue Associates, L.P.)*, 963 F.2d 503, 507–08 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 395, 121 L.Ed.2d 302 (1992). Several courts have construed the standard found in § 106(a) in a similar manner to the compulsory counterclaim rule found in Rule 13(a) of the Federal Rules of Civil Procedure.[6] *See In re University Medical Center*, 973 F.2d 1065, 1086 (3d Cir.1992); *WJM, Inc. v. Massachusetts Dep't of Public Welfare*, 840 F.2d 996, 1005 (1st Cir.1988). The Court of Appeals for the Second Circuit has neither explicitly rejected nor accepted this reasoning. It is, however, reasonable to conclude that the tests established for Rule 13(a) purposes are applicable for § 106(a) purposes as well.

The Second Circuit held that the State of New York waived its Eleventh Amendment immunity through § 106(a) when it filed an administrative expense claim in an adversarial bankruptcy proceeding. *995 Fifth Avenue Assoc.*, 963 F.2d at 509. In the adversarial proceeding, the debtor was seeking a tax refund on a gains tax levied on a sale of property. The State of New York filed an administrative expense claim seeking additional gains tax liability on the sale. The Second Circuit ruled that the original gains tax liability "arose out of the same transaction" as the administrative claim the government was making. *Id.*

This holding as well as the court's reliance on *WJM* illustrate that the test used for Rule 13(a) purposes is to be applied to § 106(a) inquiries as well. *Id.* Moreover, the legislative history of § 106(a) explains that "the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental unit of sovereign immunity with respect to compulsory counterclaims, *as defined in the Federal Rules of Civil Procedure*, that is counterclaims arising out of the same transaction or occurrence." S.Rep. No. 989, 95th Cong., 2d Sess. 29, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5815 (emphasis added). Thus, Congress intended § 106(a) to be interpreted similarly to Rule 13(a).

■ The test under Rule 13(a) is "whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir.1978). Furthermore, the Second Circuit interprets Rule 13(a) compulsory counterclaims broadly and has held that "a counterclaim is compulsory if it bears a 'logical relationship'—not necessarily an 'absolute identity of factual backgrounds' to the main claim." *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir.1979).

■ Using these standards, the Bankruptcy Court held that Marad's mortgage claims and the Debtor's preference claims were "integrally related" and met the test set forth in

---

5. Counsel for Debtor raised an argument that Marad also waived its rights through 11 U.S.C. § 106(c). Since this appeal was initiated, the *Supreme Court has ruled that § 106(c) does not* create a waiver of sovereign immunity in actions involving monetary recovery in bankruptcy. *Nordic Village*, —— U.S. at ——, 112 S.Ct. at 1016–17. Thus, Debtor's argument that § 106(c) creates a waiver here must fail. Recognizing this point, counsel for Debtor has seemingly withdrawn the argument. *See* Letter from Debtor's Counsel, dated March 17, 1993 at 2 n. 1.

Therefore, I will only address the application of § 106(a) to this case.

6. Fed.R.Civ.P. 13(a) states:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

*Harris. McLean*, 132 B.R. at 255. Marad's proof of claim and the Debtor's preference avoidance action seek the same property—the charter hire funds. Marad's proof of claim asserts an interest in the charter hire; the Debtor asserts that this interest is unenforceable. Applying the "logical relationship" test, it is clear that Marad's claim arose out of the same transaction or occurrence as the Debtor's claim. Therefore, the claims are logically related, and Marad waived sovereign immunity when it filed a proof of claim seeking the charter hire funds.

Marad argues that the proof of claim asserts a right to payment of its mortgage debt and, rather than asserting a claim to the charter hire, indicates that the charter hire is Marad's security for the debt. With this, Marad is actually arguing the merits of the avoidance claim. If the charter hire represents security for the original debt, then no transfer that can be avoided occurred. Were this the case, which as discussed below it is not, then Marad would prevail on the merits of the preference avoidance action. Whether sovereign immunity was waived or not does depend on the merits of the claims asserted. Instead, the issue for sovereign immunity is whether the claims themselves can be adjudicated. *See* House Report at 6274. Through § 106(a), Congress intended to prevent a governmental unit from a receiving a "distribution from the estate without subjecting itself to any [potential] liability it has to the estate arising from the transaction or occurrence upon which its distribution is based." *In re Prudential Lines, Inc.*, 79 B.R. 167, 180 (Bankr.S.D.N.Y.1987) (citations omitted).

Once Marad filed the proof of claim, it subjected itself to the adjudication of any action that the Debtor may have against Marad regarding the charter hire funds. The fact is that Marad's claim and the Debtor's claim both seek the same money—the money held by Chemical in the Depository Account. House Report at 6274. The claims are, therefore, logically connected so as to "arise out of the same transaction or occurrence." 11 U.S.C. § 106(a).

■ Marad also argues that the claims do not arise out of the same transaction or occurrence because they are each based on different contractual arrangements. Marad's claim is based on the 1967 and 1983 Mortgages, while the Debtor's claim is based on the Assignment. The logical relationship test does not require that the claims arise from the same agreement. *See generally Prudential Lines*, 79 B.R. at 171–74; 179–82. It only requires that the claims have a logical nexus. I cannot conceive of claims more logically related than those seeking the same property. Moreover, the Mortgages are, in fact, logically related to the Assignment. The Assignment represents a security interest in the charter hire received by USL from the chartering of ships upon which Marad held the Mortgages. Thus, by looking to the agreements rather than the property sought, the claims are logically related and arise out of the same transaction or occurrence.[7]

The Bankruptcy Court was correct in ruling that Marad waived its sovereign immunity when it filed its proof of claim. Accordingly, the Bankruptcy Court's ruling is affirmed.

### (2) *Preferential Transfer*

The Bankruptcy Court ruled that the Assignment was an avoidable transfer under § 547(b) of the Bankruptcy Code. *McLean*, 132 B.R. at 257–62. The prerequisites for a voidable preference begin with a threshold requirement that a voidable preference must involve "a transfer of an interest of the debtor in property ..." 11 U.S.C. § 547(b). If such a transfer is involved, the transfer must also be:

(1) to or for the benefit of a creditor;

---

7. Marad argues that I should apply the test set forth in *Brown v. United States (In re Rebel Coal Co.)*, 944 F.2d 320 (6th Cir.1991). The Court of Appeals for the Sixth Circuit applies a stricter standard than the "logical relationship" test. *Id.* at 321. The Second Circuit, however, applies the less stringent test for both § 106(a) and Rule 13(a) inquiries. *See 995 Fifth Avenue Assoc.*, 963 F.2d at 509; *Harris*, 571 F.2d at 123. I am, of course, bound to apply the Second Circuit's "logical relationship" test. *See United States v. Moore*, 949 F.2d 68, 71 (2d Cir.1991), *cert. denied sub nom.*, *Salami v. United States*, — U.S. —, 112 S.Ct. 1678, 118 L.Ed.2d 396 (1992). More importantly, I am bound by Congress' intent.

(2) for or on account of an antecedent debt;

(3) made while the debtor was insolvent;

(4) made on or within 90 days before the date of the filing of the petition; and

(5) one that enables the benefitted creditor to receive more than such creditor would have received had the case been a Chapter 7 liquidation and the creditor had not received the transfer.

*Id.* It is undisputed that requirements (1) through (4) have been satisfied in this case.[8] Requirement (5) is in dispute, and I address that dispute below. The major dispute in the case centers around whether the transfer in question was a transfer of an interest of the debtor in property.

(a) *Interest of the Debtor in Property*

■ A transfer of assets is preferential under § 547(b) only if the property or the interest in the property transferred belongs to the debtor. 11 U.S.C. § 547(b). *See Coral Petroleum Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1355–56 (5th Cir.1986). The Bankruptcy Court ruled that the Charters and the charter hire funds were property belonging to USL, and therefore, the Assignment was a transfer that depleted the estate's assets. *McLean,* 132 B.R. at 259–62. Marad argues that the Charters and the charter hire funds were not property belonging to USL, and therefore, the Assignment did not deplete the Debtor's estate because: (1) USL's right to bareboat charter the Vessels was valueless to unsecured creditors absent Marad's consent to the Agreement to Charter; (2) the transfer was for assets over which the Debtor had no control; and/or (3) the Assignment merely continued Marad's pre-existing lien on the Debtor's possessory

rights in the Vessels. All three arguments are without merit.

At the Petition Date, Lykes was paying the charter hire to USL for the rental value of the Vessels, pursuant to the Agreement to Charter, the Charters, and the Depository Agreement. As such, the Charters and the charter hire funds belonged to USL once Lykes and USL entered into the Agreement to Charter and Marad consented to this arrangement. Marad contends that without its consent the Charters and the charter hire would never have existed; therefore, USL's right to bareboat charter was of no value to the general creditors of USL.

Whether the right to bareboat charter was of value to the general creditors is, however, irrelevant because this right was not the interest in property that was transferred when the Debtor entered into to the Assignment. The Debtor, instead, transferred its right to receive the charter hire. While the right to bareboat charter, itself, may or may not be of value to the general creditors, the Charters and the charter hire funds are undoubtedly of value to them. Once Marad granted its consent, the Charters and the charter hire funds belonged to USL. Indeed, the charter hire funds made USL a more valuable company for all of its creditors, including Marad. Marad understood this, and with the Assignment, it attempted to keep this value for itself. The preference avoiding laws, however, prohibit such conduct.[9]

■ Marad made a calculated decision when it granted its consent to the bareboat charter. It could easily have refused to consent to the Agreement to Charter, especially

---

8. The third requirement of the § 547(b) test was challenged by Marad in the Bankruptcy Court. *See McLean,* 132 B.R. at 257–59. It was, however, not raised on this appeal. Therefore, I will not address it.

9. Marad relies primarily on *Bachner v. Robinson,* 107 F.2d 513 (2d Cir.1939), in arguing that the Assignment did not diminish the Debtor's estate. Putting aside the precedential value of a case decided nearly 40 years prior to the Bankruptcy Code taking effect, *Bachner,* in fact, fails to support Marad's position. *Bachner* involved a lessor/creditor who refused to consent to an assign-

ment of a lease prior to rent arrearages being paid. The assignee paid the arrearages *directly* to the lessor/creditor, and, as a result, consent to the assignment was given. In other words, the debtor or the general creditors never had a right to the rent arrearages. *Id.* at 514. In this case, the rent, i.e., the charter hire, did not belong to the creditor, i.e., Marad, until the assignment. Indeed, the "rent" belonged to the shipowner, i.e., USL. Thus, in *Bachner,* the transfer involved property that belonged to the creditor prior to the assignment. As a result, unlike this case, the estate in *Bachner* was not diminished.

when it must have recognized USL's imminent bankruptcy. *See McLean*, 132 B.R. at 258–59. This decision, like many made in the "real world", was risky. Unfortunately for Marad, its decision backfired when USL filed for bankruptcy protection. With this argument, Marad is asking me to undo a calculated decision that went awry. I am, however, unwilling to provide Marad with absolution for its poor decision. More importantly, the bankruptcy laws do not provide such. To so provide would give certain undersecured creditors an advantage over general creditors that Congress, by providing for avoidance of preferences, sought to preclude. *See Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1159 (D.C.Cir.1986). Therefore, once the consent was granted, the Charters and the charter hire funds belonged to USL, and through the Assignment, the transfer of this property interest depleted the Debtor's estate.[10]

■ Marad also argues that the Debtor did not have control of the charter hire funds since the Depository Agreement required Chemical to hold the funds for Marad's account. Because of this lack of control, Marad contends that the earmark doctrine protects the Assignment from a preference claim. The earmark doctrine is a judicially created doctrine. *See Smyth v. Kaufman*, 114 F.2d 40, 42 (2d Cir.1940). The cases applying the doctrine suggest that it applies where: (1) the assets in question were never under the control of the debtor; (2) the assets are transferred from a third party to the creditor as a payment for an antecedent debt owed by the debtor; and (3) the debtor's estate is not diminished in value. *See generally*, 4 *Collier on Bankruptcy*, ¶ 547.03 (15th ed. 1993). *See also McCuskey v. National Bank of Waterloo (In re Bohlen Enterprises, Ltd.)*, 859 F.2d 561, 564–67 (8th

Cir.1988); *Banque Paribas–London*, 797 F.2d at 1356.

■ The essence of the earmark doctrine is that a transfer should not be avoided where a third party transfers funds *directly* to a creditor and causes no diminution of the estate's assets. *Bohlen*, 859 F.2d at 566. The doctrine is usually applied where the third party is a new creditor who is "a guarantor for the debtor's obligation, such as a surety, a subsequent endorser or a straight contractual guarantor." *Id.* at 565. In other words, the earmark doctrine applies where the new creditor, in effect, is substituted for the original creditor. *See Banque Paribas–London*, 797 F.2d at 1356.

■ The Bankruptcy Court ruled that the Debtor had control of the assets in question. *McLean*, 132 B.R. at 261. Additionally, the Bankruptcy Court was troubled by the fact that this situation involved no new creditor as is usually the case when applying the earmark doctrine. *Id.*

Despite Marad's contention, the fact is that the Debtor was free to use the charter hire funds until: (1) it defaulted on the Insured Bonds, and (2) Marad enforced its rights under the Assignment. More importantly, the Debtor used these funds for its own purposes for some time after the Petition Date. If Marad had placed a hold on the funds prior to the Petition Date, perhaps it could legitimately argue that the Debtor had no control over the funds. *See Matter of Howdeshell of Fort Myers*, 55 B.R. 470, 474 (M.D.Fla.1985). In this case, however, where the Debtor in fact possessed and used the charter hire funds, Marad's argument borders on frivolity. By contract and in fact, the Debtor had control of the assets, and

---

**10.** The Bankruptcy Court, in the alternative, ruled that the conditional right to bareboat charter was of value to the general creditors because the restrictive covenant only gave Marad a contractual claim if the covenant was breached, thereby leaving some liquidation value as set by the market. *McLean*, 132 B.R. at 260. Marad argues that the conditional right to bareboat charter was of no value because no evidence of a market for the bareboat charters absent its consent existed. The particular value of this conditional right is somewhat elusive; however, it seems farfetched to argue that this right was worth nothing because of the restrictive covenant. The covenant did not operate as a complete bar to bareboat chartering. It simply created a contractual remedy against USL if the covenant was breached. Thus, although it limited USL's options somewhat, the restrictive covenant did not render USL's right bareboat chartering the Vessels totally worthless. Thus, even if property interest that was transferred was the right to bareboat charter, which it clearly was not, the transfer was still of value to the estate and its general creditors.

therefore the earmark doctrine does not apply.

Marad laments that the Bankruptcy Court did not cite a case that held that a new creditor must exist for the earmark doctrine to apply. Marad obviously missed the Bankruptcy Court's reference to *Bohlen*, 859 F.2d at 565. *McLean*, 132 B.R. at 261. In any event, the Bankruptcy Court did not hold that the earmark doctrine necessarily requires a new creditor in every instance. Instead, the court sensibly reasoned that as Lykes is not a creditor the earmark doctrine is inapplicable because "Lykes is not seeking to have Marad's debt satisfied and become a creditor of the Debtor's." *Id.* In other words, Lykes was not replacing Marad as a creditor. Without such a substitution, the earmark doctrine cannot be applied. *See Bohlen*, 859 F.2d at 565; *Banque Paribas–London*, 797 F.2d at 1356; *McGoldrick v. Juice Farms, Inc. (In re Ludford Fruit Products)*, 99 B.R. 18, 21 (Bankr.C.D.Cal. 1989).

Although not explicit in the Bankruptcy Court's opinion, the earmark doctrine generally requires that a new creditor replace the original creditor in order to prevent the estate's assets from diminishing. *See, e.g., In re Trinity Plastics*, 138 B.R. 203, 208 (Bankr. S.D.Ohio 1992). If Lykes was a new creditor substituting Marad, then the estate's assets would likely have not diminished. As previously discussed, however, the transfer here led to a depletion of the of the Debtor's estate. For this reason alone, the earmark doctrine is inapplicable. *See Bohlen*, 859 F.2d at 565–66.

In the end, however, Lykes did not directly transfer the charter hire funds to Marad. The funds were first part of USL's estate and were used by USL for purposes other than paying its debts on the Insured Bonds. In such a circumstance, the earmark doctrine is not applicable. *See Portside Transport, Inc. v. Van Huffel Tube Corp.*, 127 B.R. 165, 166–67 (N.D.Ohio 1989). Therefore, the Bankruptcy Court correctly ruled that the earmark doctrine does not apply to this case.

■ Finally, Marad argues that the Assignment was simply an enforcement of a security interest it already had on the Vessels. As such, Marad contends that the Assignment was only a change in the form of the previously held rights, and consequently, the Assignment did not deplete the estate's assets. In fact, Marad had only a restrictive covenant requiring its consent prior to USL's bareboat chartering of the Vessels. A restrictive covenant is not a perfected security interest or a property interest that is valid against a debtor in possession or trustee under the Bankruptcy Code. *See Allegaert v. Chemical Bank*, 657 F.2d 495, 506 (2d Cir.1980); *In re Allegheny Int'l, Inc.*, 93 B.R. 907, 909–10 (Bankr.W.D.Pa.1988). *See also Kelly v. Central Hanover Bank & Trust Co.*, 11 F.Supp. 497, 507 (D.N.Y.1935).

To argue that the restrictive covenant against bareboat chartering is a security interest in the charter hire and that the Assignment only changed the form of the arrangement is patently incorrect. *See In re Friese*, 28 B.R. 953, 955 (Bankr.D.Conn. 1983). The whole purpose behind the Assignment was to convert the restrictive covenant into a security interest. If the covenant was already a security interest, Marad would not have needed the Assignment.

■ Marad recognizes this and argues in the alternative that I should treat the restrictive covenant as being analogous to a security interest. I am, however, unwilling to do so. Restrictive covenants and security interests are different. They present different rights and obligations to parties. *See Allegaert*, 657 F.2d at 506. More importantly, these differences effect the financial terms of an agreement. The more security a creditor receives from the contractual terms of the debt it purchases, the less risky the debt becomes. It is axiomatic in finance that the pricing of a security, i.e., the rate of return demanded, is based primarily on the amount of risk the security carries. *See* Richard Brealey and Stewart Meyers, *The Principles of Corporate Finance*, 128–31 (2d ed. 1984). In essence, Marad is asking me to add retroactively security to the Insured Bonds without changing other bargained for aspects of the debt, including price. A court's role, however, is to interpret the terms of a contract and not to rewrite them. *See Metropol-*

*itan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1519–22 (S.D.N.Y.1989). Thus,

[i]f a creditor wants security, let him take a security interest in some recognized form: mortgage, pledge, an Article 9 security interest or what not. If he wants protection against third parties, let him take possession of the collateral or file. Nothing is to be gained by giving a shadowy effectiveness to informal arrangements which conform to no recognized pattern. The debtor's covenant not to encumber property, like the contractor's covenant not to assign moneys to become due under his contract, should be treated, as on the whole the case law has done, as a covenant "merely personal"—good enough to give rights against the covenantor for breach, to bring an acceleration clause into play, to constitute an "event of default" under the loan agreement, but not good enough to give rights, whether they be called legal or equitable, in property.

*Friese,* 28 B.R. at 954 n. 4, *quoting* 2 G. Gilmore, *Security Interests in Personal Property* § 38.3 at 1017 (1965).

Marad knows the difference between a restrictive covenant and security interest. It could have bargained for a security interest in any potential charter hire when it entered into the various mortgage and security agreements. It chose not to do so, and now it must live by its decision. Thus, the Bankruptcy Court correctly ruled that Marad's restrictive covenant was not a security interest in the Charters and the charter hire funds. Consequently, all three of Marad's arguments that contend that the transfer did not involve property of USL and did not diminish the estate's assets fail.

(b) *The Hypothetical Chapter 7 Liquidation*

■ The Bankruptcy Court ruled that Marad would have received less from a hypothetical Chapter 7 liquidation than it received from the Assignment. *McLean,* 132 B.R. at 262–63. The Court reasoned that Marad was an undersecured creditor. As such, the Assignment enhanced "its security cushion" so that it "became entitled to the charter hire in addition to its pre-existing security interests in the Vessels." *Id.* at 263. Marad contends that it received no more from the Assign-

ment than it would have received in a hypothetical Chapter 7 liquidation proceeding.

Marad does not argue that it would have been entitled to the charter hire funds at the end of a hypothetical Chapter 7 liquidation. In fact, at the end of a Chapter 7 liquidation, Marad would have received less than it did from the Assignment plus its pre-existing security interests. Marad, however, argues that the Bankruptcy Court should have also considered events that possibly may occur after the hypothetical Chapter 7 liquidation. Marad contends that it would have received the Vessels in the Chapter 7 liquidation and then chartered them, perhaps even to Lykes. By chartering the Vessels, it would have received at least the value it received from the Assignment, i.e., the charter hire. Therefore, it received no more from the Assignment than it would have eventually received from a Chapter 7 liquidation.

■ It is only necessary to read § 547(b)(5) of the Bankruptcy Code in order to dismiss Marad's arguments. The Code states: "the trustee may avoid any transfer . . . that enables [a] creditor to receive more than such a creditor would receive if . . . the case were a case under Chapter 7 of this title." 11 U.S.C. § 547(b)(5). The reference to the word "case" on two occasions reflects Congress' intent to compare the amount received as a result of a transfer to the amount a liquidation proceeding would yield. *See* House Report at 6328 (emphasizing that the new version of § 547(b) requires a recreation of a Chapter 7 proceeding, including all its procedural complexities, rather a general liquidation proceeding). *See also* Vern Countryman, *The Concept of Voidable Preference in Bankruptcy,* 38 Vand.L.Rev. 713, 740–41 (1985) ("The logic of Section 547(b) . . . indicates that the valuation of the collateral be made *at the time of* the Chapter 7 distribution") (emphasis added). Any value a creditor could create from what it received from a liquidation is not to be considered and is irrelevant. *See id.; Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1034 (5th Cir.1987). *See also Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1566 (11th Cir.1986) (creditor's state of mind is immaterial in determining the amount the

creditor would have received in a hypothetical Chapter 7 proceeding).

Further, as a matter of policy, a court should avoid speculation as to what a creditor may or may not do after a liquidation proceeding. It would be fallacious for a court to pretend that it could value a potential use of liquidation proceeds based only on a creditor's vague hopes or possibilities. For example, a creditor could use liquidation proceeds to purchase a risk free security, i.e., government issued bonds. Considering the interest a creditor may earn from any post-liquidation investment, however, would circumvent the purpose behind § 547(b) because eventually all liquidation proceeds will increase in value so as to be equal to the amount transferred. Yet, this is precisely what Marad is asking me to do. I will not make such a determination.

Thus, the Bankruptcy Court was correct in considering only what the hypothetical liquidation proceeding would have yielded and not what potential gain Marad may have extracted from the Vessels. The undisputed fact is that Marad was undersecured. Because of the Assignment, Marad received a security interest in the charter hire in addition to what it was entitled to in the hypothetical Chapter 7 liquidation. Consequently, Marad would have received less from a Chapter 7 liquidation proceeding than it did from the transfer. Therefore, The Bankruptcy Court correctly ruled the Assignment satisfies the fifth element of the § 547(b) requirement.

### (3) *Exceptions to Voidable Preferences*

Marad argues that both the "new value" and/or the "improvement in position" exceptions apply to these facts so as to make the Assignment non-voidable. The Bankruptcy Court ruled that neither exception applied to these facts, and for the following reasons, this ruling is affirmed.

### (a) *New Value*

Section 547(c)(1) of the Bankruptcy Code protects a transfer from avoidance if the transfer was "intended by the debtor and creditor ... to be a contemporaneous exchange for new value given to the debtor" and was "in fact a substantially contempora-

neous exchange." 11 U.S.C. § 547(c)(1). The Code, in turn, defines "new value" as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including process of such property, but does not include an obligation substituted for an existing obligation." 11 U.S.C. § 547(a)(2).

Marad argues that by granting its consent to the bareboat charter it exchanged new value to USL. In particular, Marad describes its consent as a "release ... of property." *Id.* Marad, however, had no "property" in the bareboat charters prior to the Assignment. A mortgage under the Ship Mortgage Act does not extend to the freight of the mortgaged vessel absent express language in the mortgage documents. *In re Levy–Mellon,* 61 B.R. 331, 334 (Bankr. W.D.La.1986). *See also United States v. Sterling,* 22 F.2d 323, 325 (D.N.Y.1927). A vessel's earnings, including charter hire, is part of a vessel's freight. *Levy–Mellon,* 61 B.R. at 334.

Thus, to have a property interest in the charter hire prior to the Assignment, the mortgage documents would have to expressly provide that Marad has a security interest in the Vessel's freight. No such provision, however, exists in any of the mortgage documents. Consequently, Marad did not have an express property right to the charter hire at the time the Mortgages were executed. It gained this right only through the Assignment. Additionally, as previously discussed, Marad did not have a security interest in the charter hire prior to the Assignment. Therefore, Marad had no "property" it could release or transfer so as to create "new value" when it consented to the Agreement to Charter.

Marad also argues that the term "new value" is synonymous with the contractual notion of consideration. In other words, anything that would be considered valid consideration in forming a contract is also new value for § 547(b) purposes. Moreover, Marad argues that its consent constitutes

valid consideration and therefore meets the definition of new value. The granting of the consent was a decision to forebear on a legal right, i.e., the right to sue if USL entered into a bareboat charter without Marad's consent. Forbearance is, of course, valid consideration for determining whether a contract exists. *See In re Duffy,* 3 B.R. 263, 266 (Bankr.S.D.N.Y.1980). Forbearance, however, does not constitute new value as defined by the bankruptcy code. *In re Air Conditioning, Inc. of Stuart,* 845 F.2d 293, 298 (11th Cir.), *cert. denied,* 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *Drabkin,* 800 F.2d at 1159; *Matter of Mid Atlantic Fund, Inc.,* 60 B.R. 604, 609 (Bankr. S.D.N.Y.); *Duffy,* 3 B.R. at 266.

This is particularly clear from the fact that the Bankruptcy Code specifically excludes from the definition of new value the substitution of obligations. 11 U.S.C. § 547(a)(2). The entire transaction here involved Marad substituting one obligation (the mortgages' requirement to obtain Marad's consent) for another (Marad's rights under the Assignment). As such, the Bankruptcy Code excludes Marad's forbearance from the definition of new value. Indeed, any other rule would grant an undersecured creditor more bargaining power and, therefore, an advantage over other general creditors in contravention of the goals of the Bankruptcy Code. *Drabkin,* 800 F.2d at 1159; *Chase Manhattan Bank, N.A. v. Dent (In re Trans Air, Inc.),* 78 B.R. 351, 384 (Bankr.S.D.Fla.1987). Thus, Marad's consent to the Agreement to Charter does not amount to "new value" as defined by the Bankruptcy Code.[11]

(b) *The Improvement in Position Test*

■ Section 547(c)(5) codifies the so-called "improvement in position test". 11 U.S.C. § 547(c)(5). The provision is aimed at secured creditors holding a 'floating lien' on a debtor's inventory and receivables. *See generally* 4 *Collier on Bankruptcy* § 547.13 (15th ed.1993). It permits a creditor with a perfected security interest on "receivables" of a debtor to maintain that lien as the specific accounts are repaid and replaced by new accounts without fear that a bankruptcy trustee will initiate a preference avoidance action on new receivables arising during the "preference" period. *See Braunstein v. Karger (In re Melon Produce, Inc.),* 976 F.2d 71, 75 (1st Cir.1992). This exception protects new receivables from preference challenges, however, only to the extent they substitute old ones. A grant of a security interest that improves a creditor's position is not protected. *Id.*

■ More importantly, § 547(c)(5) presupposes that the lien on receivables be perfected prior to the preference period. *See Markie v. Phillips,* 24 B.R. 712, 714 (Bankr. E.D.Cal.1982). *See also Financial Center Assoc. of East Meadow L.P. v. TNE Funding Corp. (In re Financial Center Assoc. of East Meadow, L.P.),* 140 B.R. 829, 832–33 (Bankr.E.D.N.Y.1992). Through the Assignment, Marad had a perfected security interest in the Charters on November 4, 1986. This is clearly after the preference period which began ninety days prior to the Petition Date, or August 24, 1986. 11 U.S.C. § 547(c)(5)(A)(i). Thus, since Marad did not have a perfected security interest prior to this date, the § 547(c)(5) exception is not applicable.

Even if the timing of the perfection occurred prior to the preference period, Marad clearly improved its position through the Assignment. As discussed previously, the Assignment was more than a mere change in the form of the rights already existing. Through the Assignment, Marad's security increased, and as such, this exception is not applicable.

(4) *Ratification*

Marad argues that by assuming the Charters, the Debtor assumed the burden of the charter hire payment along with the various benefits of the Charters. As such, Marad contends that the Debtor ratified the Assign-

---

11. Marad also suggests that it exchanged new value when it entered into a new ODS contract with Lykes concurrently with the Charters and the Assignment, thereby making the USL/Lykes arrangement more economically viable. Section 547(c)(1) expressly requires "new value [be] given to the debtor." 11 U.S.C. § 547(c)(1). The ODS contracts may have given Lykes new value, but they failed to give USL new value, as the term is defined by the Bankruptcy Code.

ment and that it is now bound by this determination, effectively "barring" the Debtor's claim to avoid the Assignment.[12]

The Bankruptcy Court ruled that the Charters and the Assignment are two separate agreements. Consequently, it held that the assumption of the Charters did not constitute an assumption or ratification of the Assignment. *McLean*, 132 B.R. at 265. Marad argues that the Bankruptcy Court should have ruled that the Charters and the Assignment were one agreement pursuant to the principle of *cum onere*.

■ As a general matter, once an executory contract is assumed, it is assumed *cum onere*—with all of its benefits and burdens. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 1198, 79 L.Ed.2d 482 (1984). USL assumed the Charters pursuant to the Plan. The Charters expressly provide that the charter hire funds be paid to a financial institution designated by Marad pursuant to the Assignment. It is undeniable that once the Debtor assumed the Charters it assumed its benefits along with its burdens. The issue is whether the Assignment was one of its burdens.

■ The Assignment was incorporated into the Charters. This incorporation, by itself, however, does not necessarily mean that the Assignment became one of the burdens of the Charter. The *cum onere* principle does not provide that once a contract is assumed, every single provision of that contract is enforceable by and against a debtor. *See Rockland Center Assoc. v. TSW Stores of Nanuet (In re TSW Stores of Nanuet, Inc.)*, 34 B.R. 299, 304 (Bankr.S.D.N.Y.1983). Here, the Assignment is not the basis of the Charters. In fact, Marad was not even a signatory to the Charters. Lykes and USL were the only parties that exchanged "benefits and burdens" through the Charters. Indeed, the burden that Marad argues to have

been assumed by the Debtor runs only for the benefit of Marad. Lykes had no interest as to which party received the charter hire as long as it could charter the Vessels. Thus, by assuming the Charters, the Debtor did not assume the burden of losing the charter hire Lykes was paying.

■ Moreover, application of the *cum onere* principal is subject to statutory change. The Bankruptcy Code, itself, alters the rights of the parties. *See id.* In this case, Congress has provided for the avoidance of preferential transfers. 11 U.S.C. § 547(b). Where the application of the *cum onere* principle will frustrate the intent of Congress, it is not applicable. As the Bankruptcy Court ruled:

> A voidable preferential transfer will not be otherwise cleansed of its preferential taint by somehow being cleverly tied into a separate valid and unavoidable transfer or agreement. If this were true, any clever creditor could be preferred, in direct violation of the Code, but be removed from the debtor's avoidance powers by tying it to a separate valid transaction.

*McLean*, 132 B.R. at 265. Thus, even if the *cum onere* principle were to require the Debtor to assume the "burdens" of the Assignment, which it does not, it is not applicable here because § 547(b) trumps its application. It would simply frustrate Congress' intent behind enacting § 547(b) to hold otherwise.

### (5) Estoppel

Marad argues that the Debtor should be estopped from raising this claim for avoidance of the Assignment because it represented in the Stipulation and the Disclosure Statement that it would not seek such a remedy. The Bankruptcy Court declined to apply this equitable doctrine because it found that the Debtor's acts were not egregious or

---

**12.** In a footnote in its reply memorandum of law, Marad raises the possibility that the Plan's confirmation may have had a res judicata effect, thereby barring the adversary proceeding initiated by the Debtor. *See Sure Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 876–77 (2d Cir.1991). Res judicata, however, is not a jurisdictional bar to repetitive litigation, and it can be waived. *See New York Shipping Ass'n v.*

*Federal Maritime Commission*, 854 F.2d 1338, 1352 (D.C.Cir.1988), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989). Marad never raised this defense during the Bankruptcy Court's adversary proceeding or its initial memorandum of law for that matter. Consequently, the res judicata defense was waived. Any discussion of res judicata here would, therefore, be purely academic.

dishonest so as to require equitable intervention. *McLean,* 132 B.R. at 267.

 For equitable or promissory estoppel to apply, the conduct of the party against which the claim is asserted must as a threshold matter "amount[ ] to false representations or concealment of material facts which gives the impression that the facts are otherwise than asserted." *Eastern Sys. v. West 45th Street Condominium, Inc.,* 105 B.R. 219, 234 (Bankr.S.D.N.Y.1989), *aff'd,* 1991 WL 90733, 1991 U.S.Dist. LEXIS 6935 (S.D.N.Y. May 23, 1991). Neither the Stipulation nor the Disclosure Statement misleads Marad as to whether the Debtor would seek the avoidance of the Assignment.

 The Stipulation did not address the issue of preference avoidance. It simply did not state that the Debtor would not pursue a preference avoidance claim. The fact that the Debtor was willing to let Marad have the charter hire funds is not a waiver of the right to pursue a claim later that the Assignment was an impermissible transfer of assets. Without an explicit waiver, Marad's decision to rely on the Stipulation and not seek potential legal remedies was simply a strategic decision. More importantly, the Stipulation required court approval. It never received such approval and therefore is not enforceable. *See Tavormina v. Fir, Inc. (In re Alchar Hardware Co., Inc.),* 764 F.2d 1530, 1534–35 (11th Cir.1985).

In the Disclosure Statement, the Debtor specifically stated that it "has reserved the right to assert any [avoidance] claims should the Debtor[ ] become aware of their existence. Any such claims shall become the property of ... the USL Reorganization Trust,...." Marad's decision to rely on the Disclosure Statement as some sort of waiver despite this language was again simply a strategic decision. This language clearly establishes that the Debtor did not mislead Marad as to its intentions. Thus, the Debtor did not misrepresent or conceal any facts to Marad so as to estop them from asserting a preference claim. *See Eastern Sys.,* 105 B.R. at 234. Consequently, the Bankruptcy Court correctly ruled that equitable and/or promissory estoppel was not applicable to this case.

## CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court, Cornelius Blackshear, J., is hereby affirmed in its entirety.

SO ORDERED.