859 F.2d 561
 19 Collier Bankr.Cas.2d 986, 18 Bankr.Ct.Dec. 672
 In re BOHLEN ENTERPRISES, LTD. d/b/a Central Office
Equipment, Debtor.
Thomas G. McCUSKEY, Substitute Trustee for Wesley B.
Huisinga, Appellant,
v.
The NATIONAL BANK OF WATERLOO, Appellee.
 Nos. 87-2413, 87-2442.
 United States Court of Appeals, Eighth Circuit.
 Submitted May 13, 1988.
Decided Sept. 30, 1988.
Rehearing and Rehearing En Banc Denied Feb. 17, 1989.
 
 1
 Thomas G. McCuskey, Cedar Rapids, Iowa, for appellant.
 
 
 2
 George Keith, Waterloo, Iowa, for appellee.
 
 
 3
 Before HEANEY and McMILLIAN, Circuit Judges, and HILL, Senior District Judge.*
 
 
 4
 IRVING HILL, Senior District Judge.
 
 
 5
 In this opinion we reverse a judgment of the district court in a bankruptcy case because it erroneously applied the doctrine of "earmarking" to justify rejection of a claim that a transfer of funds to a pre-existing creditor was a voidable preference.
 
 FACTS
 
 6
 Bohlen Enterprises Ltd. ("debtor") was a retail office equipment business in Waterloo, Iowa. Mr. William F. Bohlen was its president. In late April 1986 the debtor owed two separate obligations to the National Bank of Waterloo, Iowa ("bank"). One obligation was a short-term inventory loan dating from November, 1985, in the principal amount of $189,000. The other obligation was a long-standing arrangement for an open line of credit in the principal amount of $125,000. Both obligations were secured by a single security agreement.
 
 
 7
 In late April, 1986 the bank was insisting that the $189,000 obligation, which was overdue, be repaid by the end of that month. Mr. Bohlen went to the John Deere Community Credit Union ("credit union") in Waterloo and applied for a $200,000 loan. He disclosed to the credit union the debtor's $125,000 obligation to the bank but failed to disclose its $189,000 obligation. Mr. Bohlen told the credit union that if it provided the $200,000 loan, $125,000 of the proceeds would be used to repay the $125,000 obligation to the bank and the rest would be used for miscellaneous purposes. The credit union agreed to those arrangements.
 
 
 8
 Although the credit union's formal approval of the loan did not occur until May 1, 1986, it apparently determined on April 30, 1986 that the loan would be granted. On that date the credit union opened a share draft account[1] in the debtor's name and gave Mr. Bohlen some blank share drafts to use in drawing on the share draft account.
 
 
 9
 The opening of the share draft account on April 30, the day before the approval and funding of the loan, is a critical fact in the rather bizarre series of transactions which followed that event. The transcript does not disclose why the share draft account was opened in advance of the loan's being approved and funded, or why the borrower was given the blank share drafts before there was any money in the account.
 
 
 10
 In any event, Mr. Bohlen on April 30, 1986, purported to utilize and draw upon the share draft account despite the fact that on that date it had nothing in it. That day he issued a share draft on that account in the sum of $192,000 payable to the bank, which he then deposited in the debtor's checking account at the bank. He then immediately wrote three checks on the debtor's checking account at the bank totalling $191,777.27. All three checks were payable to the bank.
 
 
 11
 The three checks collectively constitute the transfer which is alleged to be the voidable preference. One was for $189,000 to repay the entire principal of the debtor's larger loan obligation. The second was for $1,708.77 which paid the interest on that obligation to date. The third check was for $1,068.50 which paid the interest on the debtor's $125,000 obligation to date. The principal of the $125,000 loan obligation remained unpaid.
 
 
 12
 The conclusion is inescapable that Mr. Bohlen on his own had decided to pay off the $189,000 obligation to the bank, which he was being pressured to retire at once, and to leave the $125,000 obligation unpaid. The conclusion is likewise inescapable that Mr. Bohlen expected his $192,000 share draft to be made good by the credit union's depositing the entire $200,000 of loan proceeds in the share draft account so that he could freely draw upon the account as he saw fit. But the credit union did not put the entire proceeds of the loan at Mr. Bohlen's disposal. Instead it deposited only $74,931.50 of the loan proceeds in the share draft account. It funded the rest of the loan on May 1, 1986 by issuing a check for $125,068.50[2] jointly payable to the debtor and the bank.
 
 
 13
 The credit union obviously intended the joint payee check to be endorsed to the bank to pay off the $125,000 obligation as Mr. Bohlen had promised. If Mr. Bohlen endorsed that check and turned it over to the bank, the bank would clearly use it as repayment of the $125,000 loan and this would leave Mr. Bohlen without funds to cover the unauthorized payment already made of the $189,000 obligation. Mr. Bohlen was apparently unable to solve that dilemma and the joint payee check was never negotiated.[3]
 
 
 14
 So on the morning of May 2, 1986, Mr. Bohlen realized that his attempt to pay off the $189,000 obligation to the bank without ever disclosing that obligation to the credit union would fail because the full $200,000 had not been put at his disposal. Only $75,000 was available to him to pay the $192,000 share draft he had written. The remaining $125,000 of new proceeds were embodied in the joint payee check and not available to him. He needed another $125,000 to cover. So on May 2, 1986, at 8:05 A.M., utilizing a drive-thru window at the credit union, Mr. Bohlen purported to deposit into the debtor's share draft account at the credit union, a check for $125,000 which he wrote on the debtor's checking account at the bank. That check, having been written on an account with no funds in it, was eventually dishonored. It seems clear that that check was written in a desperate check-kiting scheme in which Mr. Bohlen was playing for time.
 
 
 15
 In the meantime, during the night of May 1, 1986, the share draft of $192,000 was presented to the credit union for payment by the normal electronic process. It cleared electronically, i.e., it was honored and paid. The next morning, May 2, 1986, a clerk in the operations department of the credit union noted the electronic clearance but took no action because of Mr. Bohlen's deposit in the share draft account that morning of the debtor's $125,000 check drawn on the bank account. The clerk was also apparently relying on the approximately $75,000 of the loan proceeds which the credit union was transferring into the share draft account that day. The two sums together would cover the $192,000 share draft.
 
 
 16
 As of Monday, May 5 then, the picture was as follows: The credit union and the debtor had made a deal for a new $200,000 loan to the debtor with the credit union stipulating that $125,000 of the proceeds be used to retire the debtor's $125,000 obligation to the bank, the only obligation of the debtor to the bank known to the credit union. Through the share draft account, the credit union had advanced $192,000. None of that money had been used to pay the $125,000 obligation. Instead, the bulk of the money was used to pay the $189,000 obligation which was still unknown to the credit union.
 
 
 17
 The debtor filed a Chapter 11 bankruptcy petition on July 21, 1986. On August 19, 1986, the bankruptcy trustee commenced this adversary proceeding against the bank. The trustee asserted that the three checks written by Mr. Bohlen on April 30, 1986, totalling $191,777.27 in favor of the bank, constituted a voidable preference and that the said sum should be disgorged by the bank and made a part of the debtor's estate.
 
 
 18
 The bank contended that the entire sum of $191,777.27 was protected from treatment as a voidable preference by the doctrine of earmarking. It alternatively argued that it could keep the entire payment under 11 U.S.C. Sec. 547(b)(5) because it did not thereby receive a greater sum than it would have obtained in a Chapter 7 liquidation. This alternative claim was premised on an assertion that as to the entire $191,777.27, the bank (1) was a secured creditor on the date of payment by virtue of a lien derived from its security agreement and/or (2) had a right of setoff under 11 U.S.C. Sec. 553.
 
 
 19
 Following a trial, the bankruptcy judge[4] in a lengthy written opinion, held that $125,068.50 of the $191,777.27 was not a voidable preference because of earmarking. He rejected all of the bank's other claims and theories and ordered the bank to disgorge the remainder, $66,708.77.
 
 
 20
 Both sides appealed the bankruptcy court's decision, 78 B.R. 556, to the district judge,[5] who affirmed the bankruptcy court in all respects. 91 B.R. 486.
 
 
 21
 Both sides have appealed to us from the judgment below. The trustee argues that the application of the earmarking doctrine to any of the funds in issue is an error of law. The bank contends that the lower court's application of the earmarking doctrine was legally correct but did not go far enough. The bank argues that the doctrine should be extended to protect the entire $191,777.27. Alternatively, if the doctrine is held not to protect some or all of the transfer, the bank maintains that it nonetheless has a right to retain the entire sum under Section 547(b)(5) because it would have received at least an equal sum in a Chapter 7 distribution. In making this latter assertion, the bank on appeal no longer presses its claim of lien. The assertion is solely premised on the alleged right of setoff.
 
 THE MERITS
 
 22
 The prerequisites for a voidable preference are set forth in 11 U.S.C. Sec. 547(b). Section 547(b) begins with a threshold requirement that a voidable preference must involve a "transfer of an interest of the debtor in property ..." If such a transfer is involved, the transfer must also be:
 
 
 23
 (1) to or for the benefit of the creditor,
 
 
 24
 (2) for or on account of an antecedent debt,
 
 
 25
 (3) made while the debtor was insolvent,
 
 
 26
 (4) made on or within 90 days before the date of the filing of the petition, and
 
 
 27
 (5) one that enables the creditor to receive more than such creditor would receive in a Chapter 7 liquidation of the estate.
 
 
 28
 The trustee has the right to set aside as a voidable preference any transaction satisfying all of the above requirements.[6]
 
 
 29
 It is undisputed that requirements (1) through (4) above are met in the instant case. Requirement (5) is in dispute and we deal with that dispute infra. The major dispute in the case centers around the threshold requirement that the transfer being attacked be a transfer of an interest of the debtor in property.
 
 A. THE EARMARKING DOCTRINE
 
 30
 We first turn to the question of whether the earmarking doctrine was properly applied to any of the funds in this case. In so doing, it is appropriate for us to consider the origins and rationale of the doctrine and its various applications.
 
 
 31
 The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a "transfer of an interest of the debtor in property". Equivalent language has existed in the Bankruptcy Act for many decades.[7] However, neither the Act, nor the present Code, have apparently ever defined when a transfer involves "property of the debtor", leaving definition of the term entirely to the courts.
 
 
 32
 In every earmarking situation there are three necessary dramatis personae. They are the "old creditor", (the pre-existing creditor who is paid off within the 90-day period prior to bankruptcy), the "new creditor" or "new lender" who supplies the funds to pay off the old creditor, and the debtor.
 
 
 33
 When new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the old creditor, the funds are said to be "earmarked"[8] and the payment is held not to be a voidable preference.
 
 
 34
 The earliest enunciation of the doctrine occurred in cases where the new creditor providing new funds to pay off the old creditor, was himself also obligated to pay that prior debt. In other words, the new creditor was a guarantor of the debtor's obligation, such as a surety, a subsequent endorser or a straight contractual guarantor. Where such a guarantor paid the debtor's obligation directly to the old creditor, the courts rejected the claim that such payment was a voidable preference. See e.g. National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912). The holding rested on a finding that the new creditor's payment to the old creditor did not constitute a transfer of the debtor's property. The courts buttressed this conclusion with the rationale that no diminution of the debtor's estate had occurred since the new funds and new debt were equal to the preexisting debt and the amount available for general creditors thus remained the same as it was before the payment was made. A possible additional rationale may have been the view that such a result was needed to avoid unfairness and inequity to the new creditor. If his direct payment to the old creditor was voided, and the money was ordered placed in the bankruptcy estate, the new creditor, as guarantor, would have to pay a second time.
 
 
 35
 Where the guarantor, instead of paying the old creditor directly, entrusted the new funds to the debtor with instructions to use them to pay the debtor's obligation to the old creditor, the courts quite logically reached the same result. See e.g., First National Bank of Danville v. Phalen, 62 F.2d 21 (7th Cir.1932) (check made out to debtor with instructions to endorse the check to old creditor); In Re Reusch & Co. 44 F.Supp. 677, 680 (D.N.J.1942) (guarantor's funds placed in debtor's possession prior to debtor writing check for payment to old creditor).
 
 
 36
 In this latter type of case, the courts have been willing to overlook the fact that the method chosen by the guarantor to pay off the old creditor was one in which the debtor was given some control of the new funds. The courts have said that even when the guarantor's new funds are placed in the debtor's possession before payment to the old creditor, they are not within the debtor's "control". See e.g. Matter of Howdeshell of Fort Myers, 55 B.R. 470, 474 (M.D.Fla.1985); In Re Jaggers, 48 B.R. 33, 36 (W.D.Texas 1985). In some instances the language used has been that the debtor was holding the new funds "in trust" or in a "fiduciary capacity".[9] In other cases the courts have said they would not let form control over substance. See e.g. Brown v. First National Bank of Little Rock, 748 F.2d 490, 492 n. 6 (8th Cir.1984). Finally, as in the direct payment situations, almost every opinion emphasizes that the result involves "no diminution" in the debtor's estate.
 
 
 37
 The courts have extended the doctrine beyond the guarantor situations and have applied it to situations where the new creditor is not a guarantor but merely loans funds to the debtor for the purpose of enabling the debtor to pay the old creditor. The same rationales have been used to justify the results where the doctrine has been so extended, i.e., that the debtor held the new money "in trust", that the debtor did not have "control" of the new money and that the transaction did not diminish the debtor's estate. Earmarking has been held to exist where the new lender himself directly pays the old creditor, see e.g. Grubb v. General Contract Purchase Corporation, 94 F.2d 70 (2d.Cir.1938), and even in cases where the new lender entrusts the funds to the debtor with instructions to use them to pay the old creditor. See e.g. In Re Sun Railings Inc., 5 B.R. 538 (S.D.Fla.1980); 4 Collier on Bankruptcy Sec. 547.03 at 547.25 (15 ed. 1987).
 
 
 38
 As a matter of first impression, it would seem that the doctrine should not have been so extended. The equities in favor of a guarantor or surety, the risk of his having to pay twice if the first payment is held to be a voidable preference, are not present where the new lender is not a guarantor himself. Yet the courts, without much detailed anlaysis of the differences, have routinely made the extension to non-guarantors.
 
 
 39
 Where there is no guarantor, the earmarking doctrine does not help either the new creditor or the debtor. In fact the new creditor is harmed. He is a general creditor whose recovery must come from a debtor's estate which is diminished to the extent that the payment made to the old creditor cannot be recovered as a preference. The only person aided by the doctrine is the old creditor, who had nothing to do with earmarking the funds, and who, in equity, deserves no such benefit. We can see no basis for preferring this old creditor to another who was paid with non-earmarked funds.
 
 
 40
 It is not necessary for us to decide whether the earmarking doctrine, as thus far enunciated in non-guarantor situations, should be preserved, limited, or even rejected entirely. The instant case involves an extension of the doctrine beyond situations in which it has heretofore been applied. Recognizing the important public policy behind the entire scheme of voidable preferences,[10] and recognizing that the earmarking doctrine is an exclusion from the general applicability of voidable preferences, we see no basis for extending the doctrine at all and particularly to the instant facts.
 
 
 41
 In our view, the transaction should meet the following requirements to qualify for the earmarking doctrine:
 
 
 42
 (1) the existence of an agreement[11] between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt,
 
 
 43
 (2) performance of that agreement according to its terms, and
 
 
 44
 (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.
 
 
 45
 In the instant case it is crystal clear that the second requirement is not met. The agreement was not performed according to its terms and we therefore deem the decision below to be an unjustified extension of the earmarking doctrine beyond its previous boundaries. It cannot be disputed that the agreement between the parties was that part of the proceeds of the credit union's new loan would be used to pay the $125,000 obligation. For reasons of its own, the debtor did not perform that agreement. It used the funds to pay a different antecedent debt which happened to be owed to the same creditor, and of which the new lender was completely unaware. The joint payee check for $125,068.50, which could be characterized as evidence of an attempted or contemplated earmarking, was never negotiated.
 
 
 46
 To be sure, the instant case involves a very unusual situation, i.e., two separate debts being owed to the same old creditor and the new funds being used to discharge a debt to that very creditor but a debt other than the one the parties agreed would be discharged. Suppose that the debtor in the instant case had violated the agreement by using the new loan proceeds to pay an antecedent debt owed to an outsider, someone other than the bank. There is no doubt that that payment would be held to be a voidable preference despite the attempted earmarking. We see no rational basis for reaching a different result in the instant case where the debtor likewise violated his agreement with the new lender and failed to pay off the designated debt as promised.
 
 
 47
 Even if we apply the frequently invoked test of whether the debtor had "control" over the funds provided by the new lender, the instant facts nevertheless require a holding that a voidable preference has occurred. One cannot conceive of greater or more telling "control" of the new funds by the debtor than to have the debtor use them for its own purposes and in violation of its agreement with the new lender.
 
 
 48
 The bankruptcy judge apparently recognized that his decision involved an extension of the earmarking doctrine as previously applied. He invoked general equitable principles to justify the extension. As he put it, a court of equity should "look through form to substance" and should "act to achieve the intended result [of the parties]". Failure to do so, he argued, would "result in unjust enrichment to the estate and the general creditors."
 
 
 49
 We disagree. In our view, extending the doctrine to the instant facts is not required by equitable principles. We fail to see how holding this transfer to be a voidable preference could produce "unjust enrichment" to the debtor's estate or to anyone else. The recovery of voidable preferences has not been viewed as unjustly enriching the debtor's estate or the general creditors in any sense. We also fail to see how bringing the instant facts within the earmarking doctrine can be said to achieve the parties' "intended result". The general equitable concept of carrying out the parties' intent is of dubious applicability in this context, where none of the parties contemplated the debtor's bankruptcy, the unwinding of transactions, and the division of the estate. Moreover, the bank's only intention was that its $189,000 loan would somehow be repaid, regardless of the source of the funds. Finally, the transaction as consummated by the debtor, i.e., the failure to pay the $125,000 obligation and using the loan proceeds to pay off a $189,000 debt which had not been revealed to the new lender, is certainly not the result which the new lender intended. Equity does not require a court to construct a hypothetical transaction which did not occur in order to allow what is really a preference to remain in the old creditor's hands.
 
 B. THE ALLEGED RIGHT OF SETOFF
 
 50
 The bank argues that even if the doctrine of earmarking is not available to it at all, the whole payment of $191,777.27 is saved from treatment as a voidable preference by 11 U.S.C. Sec. 547(b)(5) because the payment did not result in the bank's receiving more than it would have obtained in a Chapter 7 liquidation. This contention is based on an alleged right of the bank to set off the entire payment against the debtor's total debt to the bank.
 
 
 51
 The courts below rejected the bank's setoff claim on three separate grounds, any one of which would be sufficient to deny the setoff. Each of these grounds is attacked on appeal either as an error of law or as not supported by the facts.
 
 
 52
 One of the grounds employed by the bankruptcy judge to deny the setoff claim was that the debtor's deposit of the funds was not in the ordinary course of business and was for the purpose of creating a right of setoff for the bank. Section 553(a)(3) of the Bankruptcy Code precludes setoff under such circumstances. We find no error of law as to this ground and we find adequate factual support for it in the record. It is therefore unnecessary for us to comment on the other two grounds.
 
 
 53
 For the reasons above stated the judgment below is reversed. The case is remanded to the district court for further proceedings in conformity with this opinion.
 
 
 54
 McMILLIAN, Circuit Judge, dissenting.
 
 
 55
 I respectfully dissent. I would affirm the judgment of the district court. This case involves the question whether all or part of payments totalling $191,177.27 made to the bank are voidable preferences under 11 U.S.C. Sec. 547(b). The district court ruled that the $125,068.50 payment was not a voidable preference. The district court ruled that these funds were borrowed funds which the credit union, the new creditor, had clearly "earmarked" for the payment of the debtor's debt to the bank; however, the district court determined that the balance of $66,708.77 was recoverable by the trustee as a voidable preference. As the majority opinion correctly points out, the transfer in question meets four of the requirements under Sec. 547(b) for a voidable preference. Slip op. at 564 (factors (1)-(4)). As further noted by the majority opinion, the major dispute centers on whether the transfer under attack is a transfer of an interest of the debtor in property. The majority opinion concludes that the funds constitute an interest of the debtor and, thus, the "earmarked funds" doctrine is inapplicable. I disagree.
 
 
 56
 For a preference to be avoided under Sec. 547(b), the debtor must have an interest in the property transferred so that the debtor's estate is diminished by the transfer. If a transfer has no effect on the assets of the debtor available for distribution to creditors, it is not a preferential transfer. Here, the transfer to the bank is traceable to funds the credit union lent to the debtor specifically to enable the debtor to satisfy the bank's claims. The credit union and the debtor never intended that these "earmarked" funds would become the unrestricted property of the debtor, and the debtor's payment of the "earmarked" funds to the bank in no manner diminished the debtor's estate.
 
 
 57
 The logic of the "earmarked funds" doctrine is that third party payments neither diminish the assets nor increase the liabilities of the debtor. What is done, in fact, is no more than a substitution of a new creditor for an old one. Grubb v. General Contract Purchase Corp., 18 F.Supp. 680, 682 (S.D.N.Y.1937), aff'd, 94 F.2d 70 (2d Cir.1938).
 
 
 58
 There is no dispute that the credit union's check, which was payable to the bank and the debtor jointly, in the amount of $125,068.50 was written for the purpose of paying off the debtor's debt to the bank. The fact that this particular check was not used to pay the debtor's debt to the bank in no way alters the fact that at least $125,068.50 of the credit union's funds, funds which were intended to be used to pay the debtor's debt to the bank, were in reality used for that very purpose. See In re H.G. Prizant & Co., 257 F.Supp. 145 (N.D.Ill.1965).
 
 
 59
 The substance of the trustee's argument is that once the borrowed funds are deposited in a bank account over which the debtor has total dispository control, the borrowed funds lose their status as "earmarked" funds and become property of the debtor's estate. The trustee's argument is contrary to 4 Collier on Bankruptcy p 547.03, at 547-25 (15th ed. 1987) (emphasis added; footnote omitted):
 
 
 60
 The [earmarked funds] rule is the same regardless of whether the proceeds of the loan are transferred directly by the [new creditor] to the [old] creditor or are paid to the debtor with the understanding that they will be paid to the [old] creditor in satisfaction of [the old creditor's] claim, so long as such proceeds are clearly "earmarked."
 
 
 61
 In In re Jaggers, 48 B.R. 33 (W.D.Tex.1985) (Jaggers ), the court stated:
 
 
 62
 When a debtor uses the funds of a third party to pay an obligation of the debtor the Court must look to the source of the control over the disposition of the funds in order to determine whether a preference exists. If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid independent of the third party whose funds are being used in partial payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer.
 
 
 63
 See also 4 Collier on Bankruptcy p 547.03, at 547-26. Here, the check for $125,068.50 issued by the credit union and made payable to the debtor and the bank was "earmarked" specifically for the purpose of satisfying the debtor's $125,000 obligation to the bank. While this transaction was not completed as intended, the bank did receive $191,777.27 from the funds supplied by the credit union. It was always the intention of the credit union that the bank receive at least $125,068.50, and the loan arrangements between the credit union and the debtor were such that the debtor was not to have control over that sum. Here, the debtor was a mere conduit for the transfer of funds from the credit union to the bank.
 
 
 64
 In my opinion, the debtor's momentary physical control over the funds does not preclude application of the "earmarked funds" doctrine. In the present case, the fact that the credit union clearly intended that the debtor use part of the loan proceeds to pay the bank proves that the debtor lacked dispositive control over at least those funds. See Coral Petroleum, Inc. v. Banque Paribas-London, 797 F.2d 1351, 1361-62 (5th Cir.1986).
 
 
 65
 The Jaggers case does not support the trustee's position. In that case, unlike the facts in the present case, the funds of the new creditor were available for use by the debtor generally and were not solely available for the purpose of discharging a particular debt to a particular creditor. 48 B.R. at 37. For that reason, the bankruptcy court concluded that the funds constituted assets of the debtor's estate and thus the transfer was a voidable preference. Id.
 
 
 66
 The trustee's reliance upon In re Howdeshell of Fort Myers, Inc., 55 B.R. 470, 474 (M.D.Fla.1985), and In re Telephone Stores of America, Inc., 54 B.R. 25 (D.N.M.1985), is similarly misplaced. Although the old creditor in each case claimed that the funds at issue were "earmarked," the "earmarked funds" doctrine was held inapplicable because the new creditor did not intend that the debtor use the funds to pay a particular creditor. In each case the court's decision turned on the intent of the new creditor as to the use of the funds, not the debtor's admitted actual control over the funds. In re Howdeshell of Fort Myers, Inc., 55 B.R. at 474 (debtor had absolute control over designation of creditors to be paid); In re Telephone Stores of America, Inc., 54 B.R. at 26 (intention of new creditor that debtor could do anything it wanted to with funds).
 
 
 67
 Here, the credit union clearly "earmarked" the funds by making its check payable to the debtor and the bank jointly. Consequently, these funds were never the property of the debtor. To disregard the clear intention of the new creditor is to unjustly enrich the debtor's estate as a result of the debtor's own breach of its obligation. This is the kind of injustice that the "earmarked funds" doctrine was created to avoid. For this reason, I would affirm the judgment of the district court.
 
 
 
 *
 The HONORABLE IRVING HILL, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 The record does not disclose the exact nature of a "share draft account" or the exact nature of a "share draft". So far as we can determine they are indistinguishable from the usual bank checking account and the usual form of checks used in connection with such an account
 
 
 [2]
 The odd sum of $68.50 was computed as interest due to date on the $125,000 loan. As noted supra, the debtor calculated the interest due as $1,068.50. We are unable to reconcile the difference
 
 
 [3]
 On May 5, 1986 Mr. Bohlen attempted to deposit that check into the debtor's share draft account at the credit union, with the check lacking the bank's endorsement. Because it bore the endorsement of only one payee, the credit union refused to accept it for deposit. That check was never thereafter used by anyone for any purpose
 
 
 [4]
 The Honorable Thomas Wood, United States Bankruptcy Judge, Northern District of Iowa
 
 
 [5]
 The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa
 
 
 [6]
 There are some statutory exceptions which are not applicable to this case
 
 
 [7]
 The equivalent provision of the Bankruptcy Act as it read in 1903 is quoted in National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 182, 32 S.Ct. 633, 634, 56 L.Ed. 1042 (1912). At that time the statute required a finding that the bankrupt had made a "transfer of his property"
 
 
 [8]
 In the beginning the term "earmarking" was not used. That nomenclature was apparently used for the first time in this context in Smythe v. Kaufman, 114 F.2d 40 (2d Cir.1940)
 
 
 [9]
 The term "earmarking" was probably devised as a synonym for these terms
 
 
 [10]
 The legislative history of the Bankruptcy Code clearly sets forth two rationales underlying the preference section. First, the provision for recovery of voidable preferences discourages creditors from racing to dismember the debtor during his slide into bankruptcy. Second, the provision facilitates the prime bankruptcy policy of equality of distribution among creditors of the debtor. See 4 Collier on Bankruptcy Sec. 547.01 at 547-11
 
 
 [11]
 Where a guarantor pays the old creditor directly, the requirement of an agreement between the new lender-guarantor and the debtor is inapplicable. For the reasons discussed supra, no voidable preference can exist even in the absence of a specific agreement