**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 12, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

In re: CHUZA OIL COMPANY,

    Debtor.

--------------------------------

PHILIP J. MONTOYA, Chapter 7 Trustee,

    Plaintiff - Appellee,

v.

PAULA GOLDSTEIN; BOBBY
GOLDSTEIN PRODUCTIONS INC.;
ROBERT (BOBBY) GOLDSTEIN,

    Defendants - Appellants.

No. 22-2073

_____

**Appeal from the Bankruptcy Appellate Panel**
**(BAP No. 21-029-NM)**

_____

David C. Japha (Evan J. House, with him on the briefs), Levin Jacobson Japha, P.C.,
Denver, Colorado, for Defendants-Appellants.

Daniel A. White, Askew & White, LLC, Albuquerque, New Mexico, for Plaintiff-
Appellee.

_____

Before **TYMKOVICH**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

Bobby Goldstein operated Chuza Oil Co., a New Mexico petroleum company. After encountering financial difficulties, he petitioned for Chapter 11 bankruptcy, which resulted in a plan establishing the order of priority for paying Chuza's creditors. During reorganization, Mr. Goldstein and another company he owned infused additional capital into Chuza. Some of the funds transferred into Chuza were earmarked to pay interest on a promissory note held by Mr. Goldstein's mother, Paula. After Chuza went into involuntary Chapter 7 bankruptcy, the trustee sought to claw back the payments to Paula because she was paid before creditors with higher priorities under the Chapter 11 plan.

The bankruptcy court declined to avoid the payments because it concluded Chuza did not have an interest in the earmarked funds, a requirement for avoidance under the Bankruptcy Code. On appeal, the Bankruptcy Appellate Panel saw it differently, finding Chuza had a cognizable interest because the transfers depleted the bankruptcy estate by replacing subordinated debt (the debt on Paula's note) with unsubordinated debt (debt from Mr. Goldstein's loans). Because the bankruptcy court did not clearly err in its findings that Chuza did not have an interest in the earmarked funds and that the bankruptcy estate was not diminished, we disagree with the BAP and affirm the bankruptcy court.

## I.  Background

Chuza was a New Mexico petroleum production company that Mr. Goldstein controlled as shareholder, CEO, and director. He also operated another company, Bobby Goldstein Productions, Inc. (BGPI), which Mr. Goldstein used to

2

help run Chuza.  In 2012, Mr. Goldstein's father loaned Chuza $500,000 under a promissory note guaranteed by Mr. Goldstein and BGPI.  The note was due in a year, although it could be (and was) extended.  After his father died, his mother Paula held the note.

In 2014, Chuza filed for Chapter 11 bankruptcy to reorganize its affairs.  Its plan was confirmed in March 2016.  The confirmed plan established the priority for Chuza to pay back its creditors, placing repayment to insider unsecured creditors, like Paula, below other creditors.

But business did not improve.  Beginning in September 2016 and continuing through December 2017, Mr. Goldstein, BGPI, and Paula loaned Chuza nearly $500,000 in additional funds in a futile effort to keep the business afloat.[1]  Contrary to the Chapter 11 plan, Chuza then transferred some of the money it received from Mr. Goldstein and BGPI to Paula as payment on the note even though it had not paid all remaining claims with higher priorities.  The transfers to Paula totaled $46,885.  According to the testimony of Mr. Goldstein, Chuza was loaned the $46,885 as long as the funds were used only to pay Paula.

In July 2018, a Chapter 7 involuntary bankruptcy petition was filed against Chuza.  The bankruptcy court granted the petition and appointed Philip Montoya as trustee.  Using his power to set aside certain transfers of money, the trustee later filed an adversary proceeding to avoid (1) some transfers to Paula as preferential transfers

---

[1]  On appeal, the parties only contest the loans from Mr. Goldstein and BGPI.

under 11 U.S.C. § 547(b); (2) all the transfers as fraudulent under 11 U.S.C. § 548(a)(1)(A); and (3) all the transfers as constructively fraudulent under 11 U.S.C. § 548(a)(1)(B).

The bankruptcy court refused to avoid the transfers. It concluded Chuza never had a cognizable interest in the challenged funds because they were earmarked for Paula's benefit. It also found the preferential-transfer claim failed because the defendants—Mr. Goldstein, BGPI, and Paula—established the loans were part of a contemporaneous exchange for new value (a statutory exception), the actual-fraud claim failed because there was no intent to commit fraud, and the constructive-fraud claim failed because reasonably equivalent value was exchanged for the transfers (another statutory exception). The trustee appealed to the Bankruptcy Appellate Panel, challenging the court's rulings on the preferential transfer and constructive fraud claims.

The BAP reversed. It found Chuza had an interest in the funds because the transfers diminished the estate by impairing the interests of a preferred class of creditors established by the Chapter 11 plan. The transfers did so by replacing debt that was subordinated under the plan—the original debt on Paula's note—with new, unsubordinated debt—debt to Mr. Goldstein and BGPI from the loans. The BAP also found the statutory exceptions were not satisfied.

## II. Analysis

Mr. Goldstein, his mother, and BGPI contend that Chuza never had an interest in the transferred funds: Because the funds were always earmarked to

4

Paula, they never became part of Chuza's estate. And, regardless, the defendants assert the transfers satisfied the relevant statutory exceptions.

When a party appeals from the BAP, we "independently review[] the underlying bankruptcy court's decision," examining its legal conclusions de novo and its factual findings for clear error. *In re Mkt. Ctr. E. Retail Prop., Inc.*, 730 F.3d 1239, 1244 (10th Cir. 2013). The BAP's ruling—although not entitled to deference—may be and often is persuasive. *In re Miller*, 666 F.3d 1255, 1260 (10th Cir. 2012).

### A. Jurisdiction

Before we proceed to the merits, we must first ensure we have jurisdiction. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986); *First State Bank and Tr. Co. of Guthrie v. Sand Springs State Bank of Sand Springs*, 528 F.2d 350, 353 (10th Cir. 1976). A party can only appeal to us following a *final* BAP decision, judgment, order, or decree. 28 U.S.C. § 158(d); *In re Farmland Indus.*, 567 F.3d 1010, 1015 (8th Cir. 2009). The BAP's decision is final if it "does not remand for 'significant further proceedings.'" *In re Zwanziger*, 741 F.3d 74, 75 n.1 (10th Cir. 2014) (quoting *In re Buckner*, 66 F.3d 263, 265 (10th Cir. 1995)); *see also Farmland Indus.*, 567 F.3d at 1015 (noting a BAP decision is final and appealable if it requires the bankruptcy court to perform only "ministerial duties").

The BAP remanded for the bankruptcy court to enter judgment for the trustee on the two claims at issue. Because the bankruptcy court only had to

5

perform that ministerial duty, the BAP's decision was final and appealable. *See Zwanziger*, 741 F.3d at 75 n.1; *In re Bryan*, 857 F.3d 1078, 1081 (10th Cir. 2017) (finding a BAP order appealable when it remanded for "a task requiring little judicial discretion").

### B. The Transfers

The Bankruptcy Code allows a trustee to avoid—or, colloquially, claw back—certain transfers made by a bankrupt debtor, but only if the debtor had an "interest" in the transferred property. § 547(b);[2] § 548(a)(1)(B);[3] *Mann v. LSQ Funding Grp., L.C.*, 71 F.4th 640, 645 (7th Cir. 2023). If the transfers are

---

[2] The statute provides in part:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), *avoid any transfer of an interest of the debtor in property--*
> *(1) to or for the benefit of a creditor * * *.*

§ 547(b) (emphasis added).

[3] The statute provides in part:

> *The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property*, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition * * *.

§ 548(a)(1)(B) (emphasis added).

avoided, the property goes back into the bankruptcy estate. This "prevents individual creditors from dismembering the assets of the debtor in a manner that negatively impacts other creditors, and it allows all creditors to obtain a more equitable distribution of the assets of the debtor." *In re Ogden*, 314 F.3d 1190, 1196 (10th Cir. 2002).

The trustee here sought to regain the funds Chuza transferred to Paula after the Chapter 11 plan became effective. He reasoned that Chuza had an interest in the transferred funds because the transfers replaced subordinated debt to Paula with unsubordinated debt to Mr. Goldstein and BGPI.

### 1. Earmarking

The defendants resist avoidance of the transfers, asserting the funds were properly earmarked for payment to Paula. In other words, Mr. Goldstein's loans to Chuza included a condition that some of the funds be used only to pay portions of Paula's note. Thus, Chuza could not use the funds for other corporate purposes.

The earmarking doctrine is a judicially created mechanism to determine whether the debtor had an interest in transferred property. It allows a debtor to borrow money to pay an existing creditor without the payments being avoided and the money becoming part of the bankruptcy estate, but only if the borrowed money was "earmarked" for that purpose. *See In re Marshall*, 550 F.3d 1251, 1254 (10th Cir. 2008); *Nat'l Bank of Newport v. Nat'l Herkimer Cnty. Bank*, 225 U.S. 178, 185 (1912) (applying earmarking doctrine). To earmark funds, the

7

lender must condition the funds on payment to a specific creditor, and the debtor must abide by that condition. *See* 2 *Bankruptcy Desk Guide* § 18:9 (Mar. 2023 update) ("There is an exception to the general rule that the use of borrowed funds to discharge a debt constitutes the transfer of property of the debtor and that is where borrowed funds have been specifically earmarked by a lender for payment to a designated creditor.").

Earmarking typically arises in co-debtor situations, where "the lender who provides the funds to the debtor to pay off the creditor was also obligated to the creditor either as a guarantor or surety." *Marshall*, 550 F.3d at 1257 n.5; *see also In re Bohlen Enters., Ltd.*, 859 F.2d 561, 565 (8th Cir. 1988). The doctrine ensures the funds will not be put into the estate, causing the guarantor or surety to lose that money and still be on the hook for the original debt. Even so, some courts have since extended earmarking beyond co-debtors. *See In re Moses*, 256 B.R. 641, 646 (B.A.P. 10th Cir. 2000); *Bohlen Enters.*, 859 F.2d at 566; *In re Safe-T-Brake of S. Fla., Inc.*, 162 B.R. 359, 364 (Bankr. S.D. Fla. 1993). Typically, "replacing one creditor with another of equal priority does not diminish the estate." *Safe-T-Brake*, 162 B.R. at 364; *see also* 2 *Bankruptcy Desk Guide, supra*, § 18:9 (noting that earmarking applies when "one creditor is simply substituted for another").

We have applied earmarking in several cases. For instance, in *In re Ogden*, 314 F.3d at 1199, we briefly addressed and applied it when determining whether the debtor, who ran a Ponzi scheme, "retained an interest" in fraudulently obtained

8

funds. In that case, the debtor had induced certain parties to invest in his scheme, and then used money from another individual to pay back the initial investors. After the debtor went into involuntary Chapter 7 bankruptcy, the trustee sought to avoid these payments. We determined the debtor retained an interest in the transferred funds because there was "no indication that [the investors] had designated the purpose of the investment as repaying [another investor]." *Id.*

In *In re Marshall*, 550 F.3d 1251, we acknowledged and applied earmarking with additional elaboration. In that case, the debtors used Capital One credit cards to pay down debt. After they went into Chapter 7 bankruptcy, the trustee sought to avoid those payments. The bankruptcy court concluded that the debtors lacked an interest in the payments, and the district court affirmed based on earmarking.

On appeal to our court, we applied two methods to determine whether the debtors retained an interest in the transferred property. First, we looked to whether the debtors retained some control over the funds: "[A] transfer of property will be a transfer of 'an interest of the debtor in property' if the debtor exercised *dominion or control* over the transferred property." *Id.* at 1255 (emphasis added). Second, we examined whether the transfers diminished the size of the bankruptcy estate. "Under this analysis, a debtor's transfer of property constitutes a transfer of 'an interest of the debtor in property' if it deprives the bankruptcy estate of resources which would otherwise have been used to satisfy the claims of creditors." *Id.* at 1256.

Under both approaches, we concluded the debtors had an interest in the payments. They had an interest under the dominion/control test because "Capital

9

One placed no conditions on [their] use of the funds"—they controlled those funds without restriction. *Id.* at 1257. And they had an interest under the diminution test because "[t]he Capital One loan proceeds were an asset of the estate for at least an instant before they were preferentially transferred" to pay debt. *Id.* at 1258.

We most recently considered earmarking in *In re Wagenknecht*, 971 F.3d 1209 (10th Cir. 2020). There, we again applied both tests, except this time we concluded the debtor never had an interest in the funds under either. In that case, the debtor received a loan from his mother under a promissory note that did not place any conditions on the loan. But the mother later stated in an affidavit that she only loaned her son the money on the condition it be used to pay a specific creditor. She wrote a check from her bank account and delivered it directly to the creditor; her son never actually possessed the money.

Applying the dominion/control test, we concluded the debtor did not control the funds because "he did not have 'an ability to direct their distribution'"—he was bound by his mother's condition. *Id.* at 1214 (quoting *Marshall*, 550 F.3d at 1256). Nor did he have an interest under the diminution test: The money was never in his account and he "played no role in delivering the funds." *Id.*

As established by *Ogden*, *Marshall*, and *Wagenknecht*, earmarking applies if the transfers can satisfy both the dominion/control and the diminution tests. *See also* Joan N. Feeney & Michael J. Stepan, 2 *Bankruptcy Law Manual* § 9:13 (5th ed. June 2023 update) ("Courts apply [earmarking] narrowly upon a showing of three elements: 1) an agreement between the party advancing funds and the debtor that the

10

new funds will be used to pay a specific debt; 2) implementation of the agreement; and 3) absence of any diminution of the estate."). Although in *Marshall* and *Wagenknecht* we declined to say whether the doctrine applied beyond co-debtor situations, we employed both tests even though neither case involved co-debtors.[4] *See Wagenknecht*, 971 F.3d. at 1217 (Briscoe, J., dissenting). And we have established that transfers may be avoided if the debtor had an interest in the transferred property under *either* test. *See id.* at 1214 (applying diminution test after concluding the debtor did not have an interest under dominion/control test). In other words, a debtor must "pass" both tests for earmarking to apply and to avoid avoidance.

We now proceed to the transfers at issue.

### 2. *Chuza's Transfers*

The trustee sought to avoid Chuza's payments to Paula because he believed Chuza had an interest in the funds. To do so, he invoked the two statutes at issue here: § 548(a)(1)(B) and § 547(b). Section 548(a)(1)(B) allows him to avoid transfers that occurred "on or within 2 years before the date of the filing of the [Chapter 7] petition." In this case, that means the trustee can avoid all the transfers—$46,885 in total to Paula. By contrast, § 547(b) allows him to avoid only those transfers made "between ninety days and one year before the date of the filing of the petition." Here, that is $15,635 of the $46,885.

---

[4] Of course, here we address a traditional co-debtor situation because Mr. Goldstein and BGPI guaranteed the note.

Both statutes require that the debtor have an interest in the transferred property. And because nothing indicates the meaning of "interest" differs between the statutes, earmarking is available under both. *See Mann*, 71 F.4th at 646 (noting avoidance attempts under § 547(b) and § 548(a)(1) "turn[ed] on the same question: whether the payoff agreement constituted an 'interest of the debtor in property'"); *In re TriGem Am. Corp.*, 431 B.R. 855, 864 (Bankr. C.D. Cal. 2010) (acknowledging a "'transfer of an interest of the debtor in property' is equally a statutory requirement of an action under § 548(a)(1) as it is for preferences"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 172 (2012) ("The presumption of consistent usage applies also when different sections of an act or code are at issue."). Accordingly, we analyze each of the transfers together.

Whether the debtor had an "interest" in the property is a legal question. *Marshall*, 550 F.3d at 1254. The Bankruptcy Code does not define "an interest of the debtor in property," but the Supreme Court has concluded the term is analogous to "property of the estate" as defined by § 541. *Begier v. I.R.S.*, 496 U.S. 53, 58–59, 59 n.3 (1990). Section 541(a)(1) defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." Generally, state law creates and defines property interests for bankruptcy proceedings, but "[o]nce that state law determination is made," we "look to federal bankruptcy law to resolve the extent to which that interest is property of the estate." *Ogden*, 314 F.3d at 1197 (internal quotation marks omitted). New Mexico broadly defines "property" to include "every interest a person may have in a thing that can be

12

the subject of ownership, including the right to enjoy, use, freely possess and transfer

that interest." *Muckleroy v. Muckleroy*, 498 P.2d 1357, 1358 (N.M. 1972). Because

New Mexico law does not specifically delineate whether Chuza had an interest here,

we apply our two tests. *See Marshall*, 550 F.3d at 1255; *Wagenknecht*, 971 F.3d

at 1214.

### a. Dominion/Control

At trial, Mr. Goldstein testified that the transferred funds were loaned to Chuza

as long as they were only used to pay Paula,[5] testimony the bankruptcy court deemed

---

[5] His testimony went as follows,

> [Attorney]: Well, when money went into Chuza, was there a condition that Chuza spend that money to pay Paula?
> [Mr. Goldstein]: Yes. And that was the reason for the deposits.
> [Attorney]: Okay. And as head of Chuza, when you paid Paula, you were performing that condition, weren't you?
> [Mr. Goldstein]: Yes.
> [Attorney]: Okay. What was your intention when you put all this money into Chuza?
> [Mr. Goldstein]: Which money are you referring to? The one for her deposits or the larger deposit from her?
> [Attorney]: In all of the other deposits that you made.
> [Mr. Goldstein]: The intention was to honor the obligation that Chuza, BPGI [sic], and BG had, pay interest on the note. So when I made a deposit, it was with the intention of covering that obligation.

App., Vol. II, 233. He also testified,

> [Attorney]: Did Chuza perform its obligation to pay the deposits to Paula Goldstein?
>                     * * *

"uncontradicted and plausible." App., Vol. I, 151. The bankruptcy court concluded the evidence established that Mr. Goldstein placed a valid condition on the funds he loaned to Chuza. On clear-error review, we cannot disagree.

That the condition was unwritten is of no moment. In *Wagenknecht*, we affirmed a binding condition that was unwritten and only surfaced after the fact. 971 F.3d at 1212, 1214. Of course, this case differs slightly from *Wagenknecht* because the money here passed through Chuza's account; the new creditors

---

> [Mr. Goldstein]: And when we made deposits through me or my other company, we did it with -- with the intent to cover its overhead, including those checks to Paula. When we made these deposits, I made them and earmarked the funds based on what I knew had to be paid, calculated in advance, put the money in, and the money would go out for Chuza's operating expenses and plan payments. And I put additional sums in there with the intent to pay the interest on the $500,000 note, which was guaranteed.

*Id.*, 235–36. And,

> [Attorney]: And there wasn't any -- there wasn't any contract for that, right? That was just your intent?
> [Mr. Goldstein]: Well, it's a contract amongst all the parties that we speak of, Chuza, BGPI, me, and Paula Goldstein.
> [Attorney]: When you say there's a contract, you're referring to the promissory note and personal guaranty or something else?
> [Mr. Goldstein]: I'm talking about the honor of performance, to me, is a contract.
> [Attorney]: But there's no written document that says that when you deposited X dollars, that Y dollars had to go to Paula Goldstein, is there?
> [Mr. Goldstein]: There is nothing in writing to that effect.

*Id.*, 245.

14

(Mr. Goldstein and BGPI) did not directly pay the old creditor (Paula).  But in *Wagenknecht*, we placed more significance on the debtor's lack of control than the fact that the money was never in the debtor's account.  *See id.* at 1214.  Likewise, in *Marshall*, we found it significant that the debtors had full, unconditional control of the funds.  *See* 550 F.3d at 1257.

And other courts have noted the materially significant difference between control and simple possession.  *See, e.g.*, *In re Superior Stamp & Coin Co.*, 223 F.3d 1004, 1009 (9th Cir. 2000) ("[T]he proper inquiry is not whether the funds entered the debtor's account, but whether the debtor had the right to disburse the funds to whomever it wished, or whether their disbursement was limited to a particular old creditor or creditors under the agreement with the new creditor.").  Because Chuza could only use the transferred funds to pay Paula, we conclude it did not control the funds under our dominion/control test.

### b. Diminution of the Estate

We next turn to the diminution test, which looks to whether the transfers diminished the bankruptcy estate.  The trustee asserts that the transfers diminished the estate by depriving it "of resources which would otherwise have been used to satisfy the claims of creditors."  *Marshall*, 550 F.3d at 1256.  He points to the Chapter 11 plan, which restricted Chuza's ability to pay Paula by requiring that it first pay back other creditors.  He contends that because the new debt to Mr. Goldstein and BGPI was not restricted under the plan, Chuza could pay them before

15

paying others. In other words, he believes Chuza used the transfers to ensure insiders—Paula, Mr. Goldstein, and BGPI—received their money first.

Turning to our precedent, we found a property interest in *Marshall* because the funds were part of the estate, as here, for an instant before they were transferred. 550 F.3d at 1258. But we found no interest in *Wagenknecht* because the funds were never in the debtor's account and were conditioned on paying a specific creditor. 971 F.3d at 1214.

This case differs from both, however, because at the time of the transfers, Chuza was subject to a Chapter 11 plan that required it to pay other debts before paying on the note. As the trustee argues and the BAP observed, Chuza's transfers seemingly allowed it to replace debt subordinated by the Chapter 11 plan—debt to Paula—with unsubordinated debt—new debt to Mr. Goldstein and BGPI. In other words, it did not simply "replac[e] one creditor with another of *equal priority*." *Safe-T-Brake*, 162 B.R. at 364 (emphasis added).

Of course, because of the promised transfers Chuza received significantly more money than it paid out to Paula. Viewing the economic realities of this situation, it is hard to say the transfers diminished the estate under the diminution test. To be sure, the transfers may have done so by replacing subordinated debt under the Chapter 11 plan with new, unsubordinated debt. *Cf. In re Davis*, 319 B.R. 532, 536 (Bankr. E.D. Mich. 2005) (concluding "[t]he estate was not diminished" when "[t]he [d]ebtor exchanged one secured debt for another"). Indeed, some of Chuza's debt to Paula was replaced with debt to Mr. Goldstein and BGPI. But if

16

Chuza was also restricted in its ability to pay Mr. Goldstein and BGPI or if it did not benefit from their apparent status as unsubordinated creditors, then other creditors were not hurt, and there was no diminishment.

On clear-error review, we cannot disagree with the bankruptcy court's finding that the bankruptcy estate was not diminished by the combination of payments into and out of Chuza. A factfinder could reasonably view Chuza's payments to Paula in one of two ways:

> (1) These payments harmed other unsecured creditors by forcing them to compete against Bobby Goldstein and his company for Chuza's limited assets.
>
> (2) These payments didn't harm other unsecured creditors because the payments had been conditioned on the infusion of extra cash into Chuza.

The bankruptcy court took the second view. For this finding, the court pointed out that every payment to Paula had come soon after Mr. Goldstein or his company had loaned larger amounts to Chuza and Mr. Goldstein or his company had paid Chuza more than eight times what Chuza repaid Paula.

When Chuza made the first of the transfers to Paula, Chuza was insolvent. Over the next two months, Mr. Goldstein paid over $76,000 to Chuza and it paid only $3,500 to Paula. In the next two months, Chuza received a net of $109,282 from Mr. Goldstein or his company. The pattern continued. All of Chuza's payments to Paula came right after Mr. Goldstein or his company had put a greater amount into Chuza. All told, Paula received $46,885 but Chuza received a total of $442,548.09, less the payments to Paula for a net of $395,663.09. {Bankruptcy Order at 3–4}

17

Two possible inferences exist.  One is harm to Chuza's non-insider creditors from Chuza's payments to Paula.  But the bankruptcy court could also infer that the payments from Mr. Goldstein and his company had kept Chuza afloat so that it could pay at least something to the non-insider creditors.  For that inference, a factfinder might reasonably have credited testimony by Mr. Goldstein, who explained that he had loaned the money to Chuza so that it could pay its other creditors.

Either inference is reasonable.  The bankruptcy court chose the second inference, which was permissible based on the evidence of cash infusions from Mr. Goldstein and his company.  Given the reasonableness of that inference, the bankruptcy court's finding is not clearly erroneous.[6]  *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

The BAP disregarded these infusions, focusing only on the money paid out to Paula.  This reasoning assumes that Chuza could decide how to spend the new money.  But we have already pointed out that Chuza had to spend part of the new money to repay Paula.  In similar circumstances, every circuit to address the issue has considered the infusion of new money into the bankruptcy estate when determining whether later payments had resulted in a diminution.  *See, e.g.*, *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 566 (8th Cir. 1988) (stating that the court assesses diminution by viewing the transaction as a whole, including a new creditor's infusion

---

[6] On these facts, we cannot say that the unsecured creditors were injured as a result of the transfers because the infusions into the estate were *substantially* greater than the transfers to Paula.

18

of funds to the debtor and the debtor's later repayments to an old creditor); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 400 (3d Cir. 2009) (same); *In re Superior Stamp & Coin Co., Inc.*, 223 F.3d 1004, 1008 (9th Cir. 2000) (same); *First Nat. Bank v. Phalen*, 62 F.2d 21, 22 (7th Cir. 1932) ("It is . . . well settled by the authorities that where a surety supplies out of his own funds the means for payment of an obligation whereon he is surety, the estate of his principal debtor is not thereby depleted.").

The trustee argues that we cannot consider the infusions into Chuza, relying on *In re Marshall*, 550 F.3d 1251 (10th Cir. 2008). This argument rests on a misapplication of *Marshall*. There the debtors indisputably had control over how to use the funds, *id.* at 1257, a point we also found significant in our analysis of the case above. Here, however, the bankruptcy court found that Chuza could not disregard the condition, which required Chuza to use a part of the loan proceeds to repay Paula.

In sum, the bankruptcy court correctly concluded that the earmarking doctrine was an available defense for the transfers to Paula. Under clear-error review, the bankruptcy court did not err in finding that Chuza did not control the earmarked funds, nor did the transfers diminish the estate.

### c. Statutory Exceptions

The defendants also assert statutory exceptions to the trustee's § 547(b) preferential-transfer and § 548(a)(1)(B) constructive-fraudulent-transfer claims.

First, they contend that even if Chuza had an interest in the transferred property, the trustee cannot avoid the transfers under § 547(b) because the transferred funds were "(A) intended by the debtor and the creditor . . . to be [part of] a

19

contemporaneous *exchange* for new value given to the debtor; and (B) in fact [were

part of] a substantially contemporaneous *exchange*."  § 547(c) (emphases added).

And this is true even though Chuza received the funds from Mr. Goldstein and BGPI,

not Paula.  *See In re ESA Env't Specialists, Inc.*, 709 F.3d 388, 398 (4th Cir. 2013).

Similarly, they note that the trustee cannot avoid a transfer under § 548(a)(1)(B) if

Chuza "received . . . reasonably equivalent value in *exchange* for such transfer or

obligation."  § 548(a)(1)(B)(i) (emphasis added).[7]  Whether the parties intended an

exchange is a factual question that we review for clear error.  *See In re Spada*,

903 F.2d 971, 975 (3d Cir. 1990).

The bankruptcy court concluded the exceptions were satisfied.  It found there

was a contemporaneous exchange for new value because Chuza received much more

in loans from the defendants than it paid Paula.  And the court determined there was

an exchange for reasonably equivalent value because, again, Chuza received much

more than it paid out and it was also able to pay down some antecedent debt on the

note.  The BAP disagreed.  Among other reasons, it concluded neither exception

applied because there was never any "exchange."

---

[7] This is less of an "exception" than it is an argument that a statutory requirement for
avoidance is lacking.  *Compare* § 548(a)(1)(B)(i) (noting the trustee may avoid a
transfer if the debtor "received less than a reasonably equivalent value in
exchange for such transfer or obligation"), *with* § 547(c) (providing when "[t]he
trustee may not avoid . . . a transfer").  But the difference is immaterial here
because the analysis for each statute turns on the same question: whether there was
an "exchange."

The defendants assert that the exceptions apply because, as the bankruptcy court observed, Chuza received far more than it paid Paula. Both exceptions require an "exchange," which is "the act of giving or taking one thing in return for another" or "reciprocal giving and receiving." *Webster's New Collegiate Dictionary* 395 (1979). The payments to Chuza were always contemporaneous with Chuza's transfers to Paula. For example, Paula usually received money from Chuza on the same day that Mr. Goldstein or his company paid Chuza. This course of conduct suggests that Mr. Goldstein and his company had conditioned the loans on Chuza's use of a portion to repay Paula.

The bankruptcy court could rely not only on contemporaneity but also on Mr. Goldstein's testimony that he had agreed to lend money to Chuza only if it paid some of the money to Paula. *See supra* note 5. The court regarded this testimony as "uncontradicted and plausible." App., Vol. I, 151. It also found that the "value exchanged [had] not simply [been] the payment of subordinated debt [to Paula Goldstein]." *Id.*, 152. Instead, Mr. Goldstein had "also transferred to [Chuza] a net of about $400,000, more than eight times the money paid to [Paula Goldstein]. For each of the 13 challenged payments to [Paula Goldstein], there was a contemporaneous exchange of new value." *Id.*, 152–53.

The bankruptcy court thus interpreted Mr. Goldstein's testimony to reflect his intent to pay the entire amount to Chuza in exchange for its promise to repay some of it to Paula, rather than the contrary interpretation that only part of the loan came with the condition to pay Paula. Given that the evidence allows two permissible

21

interpretations of the intent to exchange shared by Mr. Goldstein and Chuza, the bankruptcy court's finding that there was an exchange was not clearly erroneous.

In sum, the finding of an exchange satisfies the statutory exceptions that defeat the trustee's § 547(b) preferential-transfer and § 548(a)(1)(B) constructive-fraudulent-transfer claims.

## III.  Conclusion

For these reasons, we affirm the bankruptcy court's rejection of the trustee's claims involving improper preference and constructive fraud.